STATE OF CONNECTICUT *v.* CRAIG MCINTYRE
(SC 15712)

Borden, Berdon, Norcott, Palmer and Peters, Js.

Argued June 1—officially released August 31, 1999

*Glenn W. Falk,* special public defender, for the appellant (defendant).

*Robert J. Scheinblum,* assistant state's attorney, with whom were *Warren Murray,* senior assistant state's attorney, and, on the brief, *Eugene J. Callahan,* state's attorney, for the appellee (state).

*Opinion*

PALMER, J. A jury found the defendant, Craig McIntyre, guilty of felony murder in violation of General Statutes § 53a-54c,[1] and attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-134 (a) (2)[2]

---

[1] General Statutes § 53a-54c provides in relevant part: "Felony murder. A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery . . . and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants . . . ."

Section 28 of Public Acts 1992, No. 92-260 made technical changes to § 53a-54c not relevant to this appeal.

[2] General Statutes § 53a-134 (a) (2) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . is armed with a deadly weapon . . . ."

Section 58 of Public Acts 1992, No. 92-260 incorporated a technical amendment to § 53a-134 (a) not relevant to this appeal.

and 53a-49.[3] On appeal,[4] the defendant's sole contention is that the trial court improperly denied his motion for a new trial in which he had claimed that the stricken testimony of a state's witness was so prejudicial that it deprived him of a fair trial. We reject the defendant's claim and, consequently, affirm his conviction.

The jury reasonably could have found the following facts. On the evening of March 3, 1989, the defendant, who was then sixteen years old and resided in Brooklyn, New York, went with Andre Murray, Fred Kitt and Darnell Burgess to the apartment of Brent Green in the Meadow Gardens apartment complex in Norwalk. They remained there until around midnight, when they decided to go to an after hours club in Norwalk known as "Bootsy's."

The five young men took a taxicab to Bootsy's and stayed there for approximately two hours. Eventually, Burgess and Kitt attempted to call a taxi to return them to Green's apartment. Green, however, informed them that a cab already was waiting outside. The defendant and Murray followed Burgess, Kitt and Green out of Bootsy's. As the defendant and Murray proceeded through the club's front hallway toward the door, the

---

[3] General Statutes § 53a-49 provides in relevant part: "(a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime. . . ."

Section 25 of Public Acts 1992, No. 92-260 made minor technical changes to § 53a-49 not relevant to this appeal.

[4] The defendant appeals directly to this court pursuant to General Statutes § 51-199 (b), which provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

defendant, during the course of a robbery attempt, shot Ronald Wooten (victim), Green's cousin, once in the head at close range. A patron of Bootsy's called an ambulance, which transported the victim to the hospital. The victim died from injuries sustained as a result of the gunshot wound.

Upon hearing the gunshot, the driver of the cab that Burgess already had entered started to drive away. The defendant, Murray, Green and Kitt fled from Bootsy's and managed to flag down the cab in which Burgess was riding. While the five men were riding in the cab, Green asked the defendant if he had shot the victim. The defendant put his hand to his mouth, indicating to Green that he should be quiet. Once the group arrived at Green's apartment, Green again questioned the defendant about whether he had shot the victim. The defendant acknowledged that he had done so, but stated that "it was by mistake."

Kitt thereafter left Green's apartment and returned to his house. Upon his return home, Kitt's mother gave him a ride to the police station, and Kitt gave the police a statement regarding the shooting. The defendant and Murray remained in Green's apartment for approximately one hour, then went to the South Norwalk train station to return to Brooklyn. Both the defendant and Murray were arrested at the train station early in the morning on March 4, 1989. Later that day, the defendant gave a statement to the police in which he admitted shooting the victim, claiming, however, that the shooting was accidental.

The jury found the defendant guilty of felony murder and attempt to commit robbery in the first degree. Prior to sentencing, the defendant moved for a new trial.[5] In

---

[5] The defendant also moved for a judgment of acquittal on both the felony murder count and the attempted robbery count. The trial court granted the defendant's motion as to the attempted robbery count only, on the ground that that offense is a lesser included offense of felony murder.

support of his motion, the defendant claimed, inter alia, that certain testimony adduced by the state, although ultimately stricken by the trial court, was so prejudicial as to require a new trial.[6] The court denied the defendant's motion and, thereafter, rendered judgment sentencing the defendant to a term of imprisonment of twenty-five years.[7]

The defendant's sole claim on appeal is that the stricken testimony of Green, the state's witness, so prejudiced the jury that, contrary to the conclusion of the trial court, the defendant is entitled to a new trial. The state claims that, in light of the nature of Green's testimony and the trial court's curative instructions, there is no reasonable possibility that the defendant was prejudiced by the stricken testimony. We agree with the state.

The following additional facts are necessary to our resolution of the defendant's claim. At trial, the state called Kitt and Green to testify as eyewitnesses to the shooting. Kitt testified that, earlier in the evening on which the shooting had occurred, he heard the defendant say that the defendant "wanted to get somebody" before the night was over. Kitt explained that he had thought the defendant meant that he wanted to beat someone up. Kitt testified that he had not seen any member of the group with a weapon prior to the shooting.[8] Kitt further testified that he had left Bootsy's before

---

[6] The defendant raised several other claims in support of his motion for a new trial. Only his claim regarding the stricken testimony, however, is the subject of this appeal.

[7] The defendant initially failed to appeal directly from the judgment of the trial court. Approximately seven years after his conviction, the trial court, *Nigro, J.*, granted the defendant's petition for a writ of habeas corpus, thereby restoring his right to appeal.

[8] Kitt's testimony was contradicted, in part, by the testimony of another state's witness, Robert Jones, and the defendant's statement to the police. Jones testified, consistent with the defendant's statement, that Jones had given Kitt a gun to hold for the evening shortly after Kitt arrived at Bootsy's. Kitt, however, testified that he had not received a gun from Jones.

the defendant, and was about to get into the cab when he turned to look back toward the club. At that moment, Kitt saw the defendant fire the gun. Kitt testified: "It happened so fast. When it went off, it looked like he had just shot up the gun in the air and [the victim] was ducking. And, so the cab pulled off. And I chased [the cab] around the corner and I got in it." Kitt recalled that the defendant was about three feet away from the victim when the defendant fired the fatal shot.

Green, who was fifteen years old at the time of the shooting, testified that he had not heard the defendant make any comment regarding his desire to "get" anyone that evening. Green also indicated that, while the men were in Bootsy's, he observed that the defendant had a gun in his pocket.[9] Green testified that, when the shooting occurred, the defendant and the victim were approximately one to two feet apart. Green further stated that the defendant's arm had been "extended out" and that he had seen the defendant's "arm go up and . . . heard a gun go off." Green also indicated, however, that he had not been paying close attention to the defendant at the time of the shooting.

Before the state had completed its direct examination of Green, an issue arose regarding the prosecution of Green as a juvenile in connection with the shooting and attempted robbery of the victim. Specifically, the state asked Green whether he ever had indicated to anyone that he was involved in a robbery. Green replied no. At the defendant's request, the jury was excused. The defendant then informed the court that Green might have made such an admission in connection with his prosecution in juvenile court stemming from the same incident. The trial court, citing the confidentiality of

---

[9] Green also testified that the defendant had tossed the gun in the bushes adjacent to Bootsy's as the men fled after the shooting. The defendant, however, claimed that he had passed the gun to Green as they ran from Bootsy's, and that it was Green who apparently tossed the gun in the bushes.

the juvenile proceedings, determined that "a serious cross-examination and confrontation issue" existed, and ordered the state to obtain Green's permission for the release of the relevant juvenile court records before proceeding with its examination of Green. After the jury returned to the courtroom, the court instructed the jury to disregard the last question and answer regarding any admission by Green about his involvement in a robbery.

Two days later, Green's counsel informed the court that Green had refused to waive his right to confidentiality with respect to the juvenile proceedings.[10] The court concluded that the unavailability of those records deprived the defendant of a meaningful opportunity to cross-examine Green and, consequently, ordered Green's entire testimony stricken.

The trial court then instructed the jury as follows: "[T]he testimony of Brent Green, [whom] you heard two days ago, is being stricken in its entirety. It never happened. You never heard it. It plays no role in this case. It exists no longer and, therefore, is not part of this trial, and is not to be considered by you in deliberation in any way, shape or form, either by itself for substantive purposes or to contradict what another witness [had] said. The simplest, shortest way [to] say it is it never happened." The defendant did not then seek a mistrial on the basis of Green's testimony, nor did he express any disagreement with the court's curative instructions.

Thereafter, in its final instructions to the jury, the trial court charged the jury as follows: "If some evidence was presented and stricken from the record . . . you must not consider it. You must dismiss it from your

---

[10] Green chose not to waive his right to confidentiality even for the limited purpose of permitting the trial court to conduct an in camera inspection of the pertinent records.

minds and draw no inference from any [question] whose answer was stricken or from any testimony which was ultimately stricken. These matters are to be treated as though you had never known of them." Again, the defendant raised no objection to these instructions.

The principles governing our review of a trial court's ruling on a motion for a new trial are well established. "Appellate review of a trial court's decision granting or denying a motion for a new trial must take into account the trial judge's superior opportunity to assess the proceedings over which he or she has personally presided." *State* v. *Hammond*, 221 Conn. 264, 269, 604 A.2d 793 (1992). Thus, "[a] motion for a new trial is addressed to the sound discretion of the trial court and is not to be granted except on substantial grounds. . . . In our review of the denial of a motion for mistrial, we have recognized the broad discretion that is vested in the trial court to decide whether an occurrence at trial has so prejudiced a party that he or she can no longer receive a fair trial. The decision of the trial court is therefore reversible on appeal only if there has been an abuse of discretion." (Citation omitted; internal quotation marks omitted.) *State* v. *Newsome*, 238 Conn. 588, 628–29, 682 A.2d 972 (1996).

"It is to be presumed that the jury followed the court's [curative] instructions unless the contrary appears." (Internal quotation marks omitted.) *State* v. *Correa*, 241 Conn. 322, 353, 696 A.2d 944 (1997); accord *State* v. *Chance*, 236 Conn. 31, 51, 671 A.2d 323 (1996); *State* v. *Jimenez*, 228 Conn. 335, 342, 636 A.2d 782 (1994); *State* v. *Negron*, 221 Conn. 315, 331, 603 A.2d 1138 (1992). "We have repeatedly acknowledged, in cases tried to a jury, that curative instructions can overcome the erroneous effect of statements that a jury should not have heard." *Ghiroli* v. *Ghiroli*, 184 Conn. 406, 408, 439 A.2d 1024 (1981). Because "curative instructions often remedy the prejudicial impact of inadmissible evidence";

*State* v. *Nowakowski*, 188 Conn. 620, 624, 452 A.2d 938 (1982); "[w]e have always given great weight to such instructions in assessing claimed errors." *State* v. *Binet*, 192 Conn. 618, 632, 473 A.2d 1200 (1984). Thus, "[a] jury is normally presumed to disregard inadmissible evidence brought to its attention unless there is an overwhelming probability that the jury will not follow the trial court's instructions and a strong likelihood that the inadmissible evidence was devastating to the defendant." (Internal quotation marks omitted.) *State* v. *Gary*, 211 Conn. 101, 110, 558 A.2d 654 (1989). Consequently, the burden is on the defendant to establish that, in the context of the proceedings as a whole, the stricken testimony was so prejudicial, notwithstanding the court's curative instructions, that the jury reasonably cannot be presumed to have disregarded it. See *State* v. *Cruz*, 212 Conn. 351, 365, 562 A.2d 1071 (1989).

In this case, the trial court, upon learning that Green had elected not to waive his right to the confidentiality of his juvenile records, instructed the jury, in clear and emphatic terms, that it must disregard Green's testimony in its entirety. In addition, the court repeated its admonition to disregard the stricken testimony in its charge to the jury at the close of the case.

Moreover, the defendant never contested the fact that he had shot the victim. Thus, the critical issue in the case was whether the victim had been shot by the defendant during the defendant's attempted commission of a robbery. Green's testimony had little, if any, bearing on that issue because, although Green stated that the defendant had shot the victim from close range, his testimony lent no real support to the state's claim that the victim had been killed during the attempted commission of a robbery.[11] It was, perhaps, in recognition of that fact that

[11] The state also adduced evidence from Leroy Mashack, a patron of Bootsy's on the night of the murder, tending to establish that the defendant had shot the victim during the course of a robbery attempt. In particular,

the defendant failed to seek a mistrial after learning that the trial court intended to strike Green's testimony.

The defendant makes much of the fact that Green testified that the defendant was one to two feet away from the victim when he shot and killed him, while Kitt indicated that the victim and the defendant were approximately three feet apart when the defendant shot him. This minor discrepancy was not significant, however, because the precise distance between the two men when the defendant shot the victim is not probative of any significant issue in the case, including whether the defendant had shot the victim during the course of a robbery. Moreover, Kurt Nolte, the medical examiner who performed the autopsy on the victim, testified that the gunshot wound was a "contact wound," and, therefore, that the defendant likely had placed the gun directly against the victim's head when he shot and killed him.

We have recognized that "a curative instruction is not inevitably sufficient to overcome the prejudicial impact of [inadmissible] evidence . . . ." (Internal quotation marks omitted.) *State* v. *Jennings*, 216 Conn. 647, 660, 583 A.2d 915 (1990); accord *State* v. *Tinsley*, 180 Conn. 167, 170, 429 A.2d 848 (1980). In light of the substance of Green's testimony and the trial court's forceful and repetitive curative instructions, however, we are fully satisfied that the defendant was not prejudiced by the stricken testimony.[12] Accordingly, the

---

Mashack testified that he had observed the victim in the hallway of Bootsy's holding four ten dollar bills, the proceeds from a drug transaction that had taken place immediately prior to the shooting. Mashack further testified that he had stopped to talk with the victim and noticed him put the money into one of his pockets. According to Mashack, he had checked the victim's pockets after the shooting, but found no money. On cross-examination, Mashack testified that he had checked the victim's pockets because he thought that the victim had been robbed.

[12] In support of his claim, the defendant also underscores the jury's error in rendering a verdict of guilty on the attempted robbery count. The jury returned a guilty verdict on that count despite the trial court's instructions that, in the event that they found the defendant guilty of felony murder,

defendant has failed to demonstrate that the trial court improperly denied his motion for a new trial.

The judgment is affirmed.

In this opinion the other justices concurred.

they should render a verdict of not guilty on the attempted robbery count because that offense is a lesser included offense of felony murder. This error, the defendant asserts, demonstrates the jury's inability to follow the trial court's instructions. We do not find this argument persuasive. A harmless error by the jury in failing to adhere strictly to the court's instructions regarding the proper manner in which to fill out the verdict form bears no relation to the jury's ability to follow the trial court's clear and emphatic instructions to disregard Green's testimony.