## STATE OF CONNECTICUT *v.* WILLIAM TAFT
## (AC 18629)

Landau, Spear and Vertefeuille, Js.

Argued October 21, 1999—officially released March 21, 2000

*Richard E. Condon, Jr.*, deputy assistant public defender, for the appellant (defendant).

*Robert M. Spector*, deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Elpedio Vitale*, senior assistant state's attorney, for the appellee (state).

*Opinion*

VERTEFEUILLE, J. The defendant, William Taft, appeals from the judgment of conviction, rendered after a jury trial, of assault in the first degree in violation of General Statutes § 53a-59 (a) (5)[1] and carrying a pistol without a permit in violation of General Statutes § 29-35.[2] On appeal, the defendant claims that the trial court improperly (1) denied his motion for a mistrial, and (2) instructed the jury on reasonable doubt and identification. We reject the defendant's claims and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On October 19, 1994, Ernest Herold drove to the Dunbar Cafe in New Haven with two friends. Herold parked his car behind the bar and proceeded to the front of the bar, where he began talking with the owner of the bar, Robert Williams. Herold then observed a tan Lincoln being parked in front of the bar. Three men

---

[1] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when . . . (5) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of the discharge of a firearm."

[2] General Statutes § 29-35 (a) provides in relevant part: "No person shall carry any pistol or revolver upon his person, except when such person is within his dwelling house or place of business, without a permit to carry the same . . . ."

exited the vehicle, walked to the bar entrance and began talking with Williams. The three men were Andre Provite, who is the defendant's cousin, Phil Young and the defendant.

The three men entered the bar, and Herold followed shortly thereafter. Herold ordered a beer and watched the defendant, Williams and another man playing poker. After the card game, Herold heard the defendant ask Williams for money, which Williams refused. Herold then approached the bar, and the defendant turned toward him and asked Williams whether Herold was his nephew or bodyguard or had some other relation to him. Herold then left the bar. He walked to a nearby after-hours club, entered it briefly and decided to leave. Herold then headed toward his car to go home.

As he approached the Dunbar Cafe, Herold saw the defendant, Provite, Young and two other men standing together near the entrance to the bar. As Herold passed by the group, he heard the defendant say to one of the men: "What the fuck is this? Who the fuck is this guy?" Herold responded: "Why you keep asking who I am? Who are you to keep asking who I am? What is your problem?" The defendant then told Herold, "I will show you," and pulled out a chrome-colored pistol, which he pointed at Herold. Herold then turned to run, heard a gunshot and fell to the ground with a head wound. The bullet penetrated the back of his head, shattered his jaw and exited near his left cheek. Herold was then rushed to a hospital.

The defendant fled the scene with Provite and Young and, subsequently, fled the state. He was apprehended in July, 1995, in Kansas City, Missouri, and was brought back to Connecticut to face criminal charges pertaining to these events.

I

The defendant claims that the court improperly denied his motion for a mistrial. We disagree.

"A mistrial is appropriate only where it is apparent to the court that as a result of some occurrence during the trial a party has been deprived of an opportunity for a fair trial. . . . The trial court . . . has great latitude in ruling on a motion for a mistrial. . . . The question on appeal is . . . whether the trial court, in refusing to grant a new trial, so far exceeded or abused its discretion so as to warrant granting a new trial. . . . In reviewing motions for mistrial, our Supreme Court has determined that [i]f curative action can obviate the prejudice, the drastic remedy of mistrial should be avoided." (Citations omitted; internal quotation marks omitted.) *State* v. *Melillo*, 17 Conn. App. 114, 119, 550 A.2d 319 (1988).

## A

The defendant first claims that the court improperly allowed the state to impeach him on the basis of his postarrest custodial silence.[3] The following additional facts are necessary for a resolution of this issue.

At trial, Provite testified that although he was at the Dunbar Cafe, he was in his car at the time of the shooting and did not witness it. Provite testified that moments after he heard a shot being fired, he saw the defendant, who was not carrying a gun, approach his car.

Provite's testimony was impeached with a taped statement that he gave police the day after the shooting. In Provite's taped statement, he said that the defendant shot Herold, that he saw Herold fall to the ground with the defendant standing over him with a gun, and that he drove the defendant from the scene because he was afraid that otherwise the defendant would shoot him.

The defendant testified that an unidentified person bought drugs from Herold and then stood behind him

---

[3] The defendant moved to strike this evidence at trial; however, he limits the issue on appeal specifically to whether the trial court improperly denied his motion for a mistrial.

and shot him in the head. Further, the defendant testified that he fled the scene with his cousin because he was so disturbed by the shooting.

On cross-examination, the prosecutor attempted to discredit the defendant's testimony by asking numerous questions about why the defendant did not contact Provite, his cousin, subsequent to his arrest. The prosecutor questioned the defendant's failure to ask his cousin to confirm for the police his version of the events on the night of the shooting. Both the defendant and Provite testified that they had not spoken after the arrest.

During redirect examination, defense counsel established that she had specifically instructed the defendant not to talk to Provite or any other witnesses. The state then advised the court that it intended to put on evidence concerning the amount of time that had passed between the defendant's arrest and when he began being represented by defense counsel. Defense counsel objected to this evidence.[4]

The prosecutor, however, elicited during recross-examination that defense counsel did not represent the defendant and therefore did not instruct him to be silent until approximately two months after his arrest. The defendant subsequently moved for a mistrial, claiming that the state's questions concerning his postarrest silence were improper.

The court determined that a mistrial was not necessary and gave the jury a curative instruction to remedy any possible prejudice.[5] The court reasoned that the

[1] Defense counsel did not object to the line of questioning about the defendant's failure to contact Provite until the prosecutor indicated to the court that during his rebuttal case, he intended to establish exactly when defense counsel started representing the defendant.

[5] The court's curative instruction stated in relevant part: "Let me talk about all of the witnesses. You know and can recall all the different testimony. Now, you know that Mr. Provite testified and gave two versions of the event, and I have given you instructions on how to evaluate that testimony. You heard the defendant testify and, under one version of Mr. Provite's and [the defen-

prosecutor's line of questioning was proper because it was relevant to the credibility of the defendant and Provite, and had nothing to do with the defendant's constitutional right to remain silent. We agree.

The curative instruction cautioned the jury that the evidence concerning the defendant's failure to call Provite could be considered only with respect to the credibility of Provite and the defendant. The court further cautioned the jury that if it found that the defendant did not contact Provite because of the advice of his counsel, it should not draw any unfavorable inferences from this fact.

The defendant relies on *State* v. *Ferrone*, 97 Conn. 258, 116 A. 336 (1922), to support his claim that the prosecutor's questions on the defendant's silence were improper. In *Ferrone*, our Supreme Court held that "when the accused is *in custody*, our law accords [the accused] the right to reply to question or statement, or to remain silent. [The accused's] silence under such circumstances cannot be laid in evidence against him." (Emphasis added.) Id., 266. The defendant's silence in

dant's] testimony, the thrust of that testimony is that this crime was committed by others, and [the prosecutor] on cross-examination asked [the defendant] why he didn't call his cousin right away to help him, to exculpate him, to explain all this because there was, or there is, a version which you are entitled to accept—that is what jurors do—which has another man or group of men committing this crime. What I want to caution you about [is] that [this] evidence is offered only on the question of [the] credibility of [the defendant] and Mr. Provite, and [that the defendant] testified that his reason, a portion of his reason for not calling his cousin, was that his attorney had told him not to. A person acting on advice of counsel, if you choose to believe that reason for not calling, you should draw no unfavorable inference from the fact that [the defendant] did not make any [telephone] call after he had been advised not to speak to anyone by his lawyer. Draw no unfavorable inference from that. All right, do you understand that? Okay. It might be a minor point, but the message that I want to get to you is that whenever anybody exercises their constitutional right to remain silent, whenever anyone does not communicate with someone on the advice of counsel, that is not a negative factor at all in a trial."

the present case did not occur while he was in custody or while being questioned by the police. Therefore, the rule in *Ferrone* does not apply.

The defendant also relies on *State* v. *Bates*, 140 Conn. 326, 99 A.2d 133 (1953). In *Bates*, the Supreme Court applied *Ferrone* and held that although the defendant was not physically in custody because he had been released on bail, he was in constructive custody, and his silence in the face of an accusation concerning his guilt was inadmissible. Id., 330. In the present case, however, the evidence concerning the defendant's failure to contact his cousin was not admitted to prove guilt. The court instructed the jury immediately after the defendant testified, and the court stated that the evidence was to be used only for credibility purposes.

We conclude that the court properly limited to the issue of credibility the admission of the state's questioning concerning the defendant's silence. The court, therefore, properly denied the motion for a mistrial.

B

The defendant next claims that the court improperly denied his motion for a mistrial because it allowed the state to impeach him for remaining silent without determining outside the jury's presence whether his silence was due to the advice of counsel. The defendant relies on *State* v. *Bryant*, 202 Conn. 676, 523 A.2d 451 (1987), in support of his claim. Our Supreme Court in *Bryant*, however, established guidelines for the cross-examination of alibi witnesses, not defendants, in criminal trials.

In *Bryant*, the court ruled that to lay a proper foundation for the impeachment of an alibi witness on the basis of his or her failure to come forward prior to trial to tell the police about a defendant's alibi, it may be necessary to establish that the witness (1) was aware

of the nature of the charges, (2) had reason to recognize that he or she possessed exculpatory information, (3) had a reasonable motive for acting to exonerate the defendant and (4) was familiar with the means to make such information available to the authorities. Id., 705. The court in *Bryant* reasoned that laying a proper foundation for an alibi witness' silence may aid the trier of fact in determining whether the witness' testimony is accurate or a recent fabrication. Id. Further, the court reasoned that "[c]ommon sense and human experience may indicate, in a given case, that there may be explanations for a witness' pretrial silence that are entirely consistent with that witness' posture at trial." Id. Thus, the court in *Bryant* was concerned with a "witness [who] is cast in the posture of having been silent as to claimed exculpatory testimony and *is not given a real opportunity to explain that silence* . . . ." (Emphasis added.) Id., 704. The court's holding in *Bryant*, however, is not applicable to the facts of this case. *Bryant* addressed the impeachment of alibi witnesses for failing to come forward before trial and tell the police about a defendant's alibi. *Bryant* does not concern the impeachment of a defendant. In this case, the evidence concerning the defendant's silence was elicited through the defendant's own testimony, and the defendant gave an explanation for his failure to contact his cousin. We therefore conclude that the rule in *Bryant* does not apply to the facts of this case and that the defendant's claim is without merit.

## II

The defendant next claims that the court improperly charged the jury on the definition of reasonable doubt and on identification. We disagree with both arguments.

## A

The defendant claims that the court improperly instructed the jury that reasonable doubt is not a "doubt

suggested by the ingenuity of counsel"[6] and that the court's use of that language warrants a reversal of the judgment of conviction.

The standard of review for constitutional claims of improper jury instructions is well settled. "In determining whether it was . . . reasonably possible that the jury was misled by the trial court's instructions, the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding them to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied . . . is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result. . . . *State* v. *Schiappa*, 248 Conn. 132, 171, 728 A.2d 466 (1999); accord *State* v. *Prioleau*, 235 Conn. 274, 284, 664 A.2d 743 (1995)."

---

[6] The court's instruction on the concept of reasonable doubt was as follows: "Reasonable doubt. The meaning of reasonable doubt can be arrived at by emphasizing the word reasonable. It is not a surmise, a guess or mere conjecture. Nor is it doubt suggested by the ingenuity of counsel or a juror not warranted by the evidence. It is such a doubt as in serious matters that concern you, you would heed. That is, such a doubt as would cause reasonable men and women to hesitate to act upon it in matters of importance. It is not hesitation springing from any feelings of pity or sympathy for the accused or any other person who might be affected by your decision. It is, in other words, a real doubt, an honest doubt, a doubt that has its foundation in the evidence or lack of evidence. It is doubt that is honestly entertained and is reasonable in light of the evidence after a fair comparison and careful examination of the entire evidence.

"Proof beyond a reasonable doubt does not mean proof beyond all doubt. The law does not require absolute certainty on the part of the jury before it returns a verdict of guilty. The law requires that after hearing all the evidence, if there is something in the evidence or lack of evidence that leaves in the minds of the jurors as reasonable men and women a reasonable doubt as to the guilt of the accused, then the accused must be given the benefit of that doubt and acquitted. Proof beyond a reasonable doubt is proof that precludes every reasonable hypothesis except guilt and is inconsistent with any other rational conclusion."

(Internal quotation marks omitted.) *State* v. *Delvalle*, 250 Conn. 466, 470, 736 A.2d 125 (1999).

Recently, in *State* v. *Delvalle*, supra, 250 Conn. 475, our Supreme Court rejected the claim that the use of "ingenuity of counsel" language was violative of a defendant's constitutional right to counsel and to a fair trial or that it was plain error. The *Delvalle* court reasoned that the Supreme Court has repeatedly "upheld similar language on the ground that [it] did not, when properly considered in the broader context of the trial court's instructions in their entirety, [dilute] the state's burden of proof or otherwise misle[ad] the jury in any way. . . . *State* v. *Taylor*, 239 Conn. 481, 504–505, 687 A.2d 489 (1996), cert. denied, 521 U.S. 1121, 117 S. Ct. 2515, 138 L. Ed. 2d 1017 (1997); cf. *State* v. *Edwards*, 247 Conn. 318, 329–30, 721 A.2d 519 (1998); *State* v. *Hines*, 243 Conn. 796, 817–20, 709 A.2d 522 (1998)." (Internal quotation marks omitted.) *State* v. *Delvalle*, supra, 474.

Although the court in *Delvalle* rejected the constitutional challenge to the "ingenuity of counsel" instruction, the court stated that "[t]o avoid any possibility of juror confusion arising from the use of the phrase, we invoke our supervisory authority over the administration of justice to direct our trial courts to refrain from using the 'ingenuity of counsel' language in the future." Id., 475–76. The court's jury instruction in this case was given before the *Delvalle* court's direction about the future use of the "ingenuity of counsel" language, and, when viewed in the context of the instructions as a whole, could not have misled the jury. See id., 474; *State* v. *Young*, 56 Conn. App. 831, 843, 746 A.2d 795 (2000).

B

The defendant next claims that the court improperly instructed the jury on the issue of identification in that it failed to include in its instructions his requested charge

under *United States* v. *Telfaire*, 469 F.2d 552 (D.C. Cir. 1972).[7]

"Our standard of review on this [nonconstitutional] claim is whether it is reasonably probable that the jury was misled. . . . The test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Therefore, jury instructions need not be exhaustive, perfect, or technically accurate. Nonetheless, the trial court must correctly adapt the law to the case in question and must provide the jury with sufficient guidance in reaching a correct verdict." (Citation omitted; internal quotation marks omitted.) *Thames River Recycling, Inc.* v. *Gallo*, 50 Conn. App. 767, 774, 720 A.2d 242 (1998).

"[W]e note that there is no constitutional right to an instruction on the fallibility of eyewitness identifications. . . . Although such an instruction may be given in an appropriate case . . . it is not reversible error for a trial court to refuse to give a *Telfaire* instruction where the conviction of the defendant did not turn upon the testimony of eyewitnesses who were uncertain, unclear or inconsistent. . . . The ultimate test of a court's instructions is whether, taken as a whole, they fairly and adequately present the case to a jury in such a way that injustice is not done to either party under the established rules of law." (Citations omitted; internal

---

[7] A charge under *United States* v. *Telfaire*, supra, 469 F.2d 558–59, instructs the jury to consider, in evaluating the identification testimony of a witness, the following factors: The adequacy of the witness' opportunity and capacity to observe the perpetrator, the length of time to observe the perpetrator, the proximity of the witness to the perpetrator, whether the witness knew or saw the perpetrator prior to the incident, whether the identification was the product of the witness' own recollection and the credibility of the witness.

quotation marks omitted.) *State* v. *Anderson*, 20 Conn. App. 271, 281–82, 566 A.2d 436 (1989), cert. denied, 213 Conn. 813, 569 A.2d 549 (1990).

The defendant filed a request to charge on the issue of identification, asking the court to instruct the jury concerning the dangers of misidentification in accordance with *Telfaire*. The defendant asked that in addition to the standard language given on identification, the jury be instructed to consider factors such as the witness' opportunity to observe the perpetrator, taking into consideration time, distance and lighting, whether the witness knew the defendant prior to the offense, whether the witness was under the influence of drugs or was under stress at the time of the offense, whether the identification was solely the product of the witness' own recollection, the witness' credibility, and the length of time between the offense and the witness' next opportunity to see the defendant.

"It is not error for a trial court to refuse to charge a jury in the exact words of a requested instruction, as long as the requested charge is given in substance." (Internal quotation marks omitted.) *State* v. *Collins*, 38 Conn. App. 247, 254, 661 A.2d 612 (1995). Although the court's instruction in this case did not mirror the defendant's request to charge, it did cover the substantive points that he requested.[8] In addition, the court

---

[8] The court charged the jury in relevant part as follows: "In arriving at a determination as to the matter of identification, you should consider all the facts and circumstances that existed at the time of the observation of the perpetrator by each witness. In this regard, the reliability of each witness is of paramount importance, since identification testimony is an expression of belief or impression by the witness. Its value depends upon the opportunity and ability of the witness to observe the offender at the time of the event and to make an accurate identification later. It is for you to decide how much weight to place upon such testimony. In appraising the identification of any witness, you should take into account whether the witness had adequate opportunity and ability to observe the perpetrator on the date in question. This will be affected by such considerations as the length of time available to make the observations, the distance between the witness and the perpetrator, the lighting conditions at the time of the offense, whether

gave general instructions on the credibility of witnesses that reiterated some of those same points.[9]

Our review of the charge as a whole reveals that the court's instructions were accurate and comprehensive, and furnished adequate guidance to the jury. See id., 255; *State* v. *Hardison*, 16 Conn. App. 142, 146–47, 546 A.2d 968 (1988). The court did not improperly fail to give the requested *Telfaire* instruction because the "salient principles of the court's charge adequately covered the dangers of misidentification . . . ." (Internal quotation marks omitted.) *State* v. *Collins*, supra, 38 Conn. App. 255. We conclude that the defendant's claim is without merit.

The judgment is affirmed.

In this opinion the other judges concurred.

the witness had known or seen the person in the past and whether anything distracted the attention of the witness during the incident. You should also consider the witness' physical and emotional condition at the time of the incident, and the witness' powers of observation in general. In short, you must consider the totality of the circumstances affecting the identification."

[9] As to the credibility or believability of witnesses, the court stated: "In deciding what the facts are, you must consider all of the evidence. In doing this, you must decide which testimony to believe and which testimony not to believe. You may believe all, none or any part of any witness' testimony. In making that decision, you may take into account a number of factors, including the following. One, was the witness able to see or hear or know the things about which that witness testified? Two, how well was the witness able to recall and describe those things? Three, what was the witness' manner while testifying? Four, did the witness have an interest in the outcome of this case or any bias or prejudice concerning any party or any matter involved in this case? Five, how reasonable was the witness' testimony considered in light of all of the evidence in the case? Six, was the witness' testimony contradicted by what that witness has said or done at another time, or by the testimony of other witnesses or by other evidence?

"If you should think that that witness has deliberately testified falsely in some respect, you should carefully consider whether you should rely upon any of that witness' testimony. In deciding whether or not to believe a witness, keep in mind that people sometimes forget things. You need to consider, therefore, whether a contradiction is an important lapse of memory or an intentional falsehood, and that may depend on whether it has to do with an important fact or with only a small detail."