## STATE OF CONNECTICUT v. ALPHA WILLIAM NIMS
(AC 22201)

Foti, Dranginis and Stoughton, Js.

Argued March 26—officially released June 11, 2002

*Suzanne Zitser*, assistant public defender, for the appellant (defendant).

*Richard F. Jacobson*, special assistant state's attorney, with whom, on the brief, was *John C. Smriga*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

FOTI, J. The defendant, Alpha William Nims, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a (a),[1] conspiracy to commit murder in violation of General Statutes §§ 53a-48 (a)[2] and 53a-54a (a), and unlawful restraint in the first degree in violation of

---

[1] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

[2] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

General Statutes § 53a-95 (a).[3] The court imposed a total effective sentence of seventy years of incarceration. On appeal, the defendant claims that the trial court improperly (1) instructed the jury as to the concept of reasonable doubt, (2) admitted hearsay testimony from two state's witnesses and (3) admitted evidence of the victim's attempt to file a complaint against him. We affirm the judgment of the trial court.

From the evidence adduced at trial, the jury reasonably could have found the following facts. At some point prior to June, 1998, the defendant began to handle the affairs, including financial affairs, of his aunt, Elizabeth Holbrook. Holbrook had suffered from memory lapses and other ailments and, in the spring of 1998, was admitted to a medical care facility. The defendant resided in her Stratford home, obtained a power of attorney over her affairs, exercised control over her financial matters and made withdrawals from her bank accounts. The victim, Melvin Courtney, was the defendant's uncle and Holbrook's brother.

In May, 1998, the victim, motivated in part by concerns that the defendant was mishandling Holbrook's financial affairs, left his residence in Rochester, New York, to stay with the defendant in Holbrook's home. Shortly thereafter, the victim discussed the defendant's handling of Holbrook's affairs with the defendant. The victim came to believe that the defendant was using Holbrook's accounts for his personal use and, in June, 1998, the victim sought to become the conservator of Holbrook's estate.

The defendant grew increasingly displeased with the victim's interference with his handling of his aunt's

---

[3] General Statutes § 53a-95 (a) provides: "A person is guilty of unlawful restraint in the first degree when he restrains another person under circumstances which expose such other person to a substantial risk of physical injury."

affairs. The defendant spoke about the situation with an acquaintance of his, William Preston. He told Preston that the victim was seeking to prevent him from using his aunt's money and that he wanted to end the defendant's interference. Both the defendant and Preston formulated a plan to "subdue [the victim] so he would be out [of] the way."

On or around July 25, 1998, in the early morning hours, the defendant and Preston waited outside of the victim's bedroom. The victim awoke to use the bathroom and, after he did so, Preston grabbed him while the defendant placed handcuffs on him. The defendant and Preston, attempting to subdue him, knocked the sixty-six year old victim to the ground. The victim tried to apologize to the defendant, but the defendant struck the victim's stomach and affixed duct tape over his mouth. The defendant yelled at the victim, telling him that he warned him to stay out of his business. The defendant eventually smothered the victim, thereby causing his death. After helping the defendant subdue the victim, Preston went to the defendant's car. Several minutes later, the defendant came outside and drove Preston to a nearby train station.

Over the course of the next few days, the defendant called Preston on the telephone and told him that he needed further help. At some point, the defendant drove to New Haven to meet Preston. When the two men arrived at Holbrook's house, they approached the victim's body, wrapped in bedding, lying on the floor in one of the second floor bedrooms.

In the early morning hours of July 28, 1998, the defendant and Preston carried the victim's body out of the house, ultimately placing the body in the back of the victim's truck. The men thereafter drove to a location on a nearby farm where, earlier that day, they had prepared a ditch in which to dispose of the body. The

defendant drove the victim's truck while Preston, driving the defendant's Chevrolet Beretta, followed him. After burying the body, the two men reentered the vehicles and drove away from the scene.

Shortly thereafter, at around 3:40 a.m., a police officer operating a marked cruiser attempted to stop Preston's vehicle after noticing that the vehicle's headlamps were not illuminated. Preston failed to stop for the officer. Instead, he drove off, struck a tree and fled from the vehicle on foot. At that time, the vehicle was located close to the defendant's home. Preston hid in a nearby shed before meeting the defendant several hours later. The defendant returned to his vehicle a short time later. He told police officers investigating the incident that he had lent his vehicle to Preston and that he did not know why Preston had fled from the vehicle. The defendant told police officers that he was concerned and was out looking for the car because Preston had not returned with it. During this original stop and search of the vehicle, a police officer noticed digging implements in the vehicle's trunk.

At around 8 a.m. on July 28, 1998, the owner of the farm where the defendant had buried the victim discovered the victim's body. Police responded to the scene shortly thereafter and, in the course of their investigation, recognized the significance of the earlier incident involving the stop of the defendant's vehicle. During the morning, the defendant washed his vehicle. Police investigators returned to the defendant's home that afternoon and seized the defendant's car and several items from the residence. Additional facts will be set forth as necessary to resolve the issues on appeal.

I

The defendant first claims that the judgment should be reversed because the trial court violated our Supreme Court's directive in *State* v. *Delvalle*, 250 Conn.

466, 475–76, 736 A.2d 125 (1999), to refrain from using the " 'ingenuity of counsel' " language when instructing the jury on the concept of reasonable doubt. The trial court gave the instruction almost one year after *Delvalle*'s publication.[4] We disagree.

The court instructed the jury on the issue of reasonable doubt as follows: "Reasonable doubt. We have talked about reasonable doubt. You have heard the phrase. What does it mean? It doesn't have any technical or unusual meaning. You can arrive at it simply by emphasizing the word reasonable. Reasonable doubt is a doubt for which a valid reason can be assigned. It's a doubt which is something more than guess or surmise. It's not conjecture or fanciful. A reasonable doubt is not a doubt which is raised by someone simply for the sake of raising doubt. *Nor is it a doubt suggested by the ingenuity of counsel or any of your fellow jurors, which is not justified by the evidence or lack of evidence in this case.* A reasonable doubt is a doubt based on reason and not on the mere possibility of innocence. It is a doubt for which you can in your own mind consciously give a reason. A reasonable doubt, in other words, is a real doubt. It's an honest doubt. A doubt which has its foundation in the evidence or lack of evidence. It's the kind of doubt which in the serious affairs of your life you would pay heed and attention to. Of course, absolute certainty in the affairs of life is almost never attainable, as we all know. And the law does not require absolute certainty on the part of the jury before you can return a verdict of guilty. The state does not have to prove guilt beyond all doubt or to a mathematical or absolute certainty. . . . What the law does require, however, is that after hearing all the evidence in the case if there is something in the evidence or lack of evidence which leaves in your minds as rea-

---

[4] The court instructed the jury on June 8, 2000. Our Supreme Court released *Delvalle* on August 24, 1999.

sonable men and women a reasonable doubt about the guilt of the accused, then the accused must be given the benefit of the doubt and acquitted. If there is no reasonable doubt, then the accused must be found guilty. Proof beyond a reasonable doubt is proof which precludes every reasonable hypothesis except guilt. It is consistent with guilt and inconsistent with any other reasonable conclusion. If you can in reason reconcile all of the facts proved with any reasonable theory consistent with the innocence of the accused, then you cannot find him guilty." (Emphasis added.)

The defendant objected to the charge as given and noted his exception as follows: "I take exception to the court's not charging as requested on reasonable doubt, presumption of innocence. . . . I have provided the court with a written request to charge and I won't explain further because I believe I have preserved whatever claim I have." The defendant's request to charge on the concept of reasonable doubt did not include the language at issue here. Neither the state nor the defendant alerted the court as to its violation of our Supreme Court's directive to refrain from including such language in instructing the jury as to the definition of reasonable doubt.

"[I]n *State* v. *Delvalle*, supra, 250 Conn. 475, our Supreme Court rejected the claim that the use of ingenuity of counsel language was violative of a defendant's constitutional right to counsel and to a fair trial or that it was plain error. The *Delvalle* court reasoned that the Supreme Court has repeatedly upheld similar language on the ground that [it] did not, when properly considered in the broader context of the trial court's instructions in their entirety, [dilute] the state's burden of proof or otherwise misle[ad] the jury in any way. . . .

"Although the court in *Delvalle* rejected the constitutional challenge to the ingenuity of counsel instruction,

the court stated that [t]o avoid any possibility of juror confusion arising from the use of the phrase, we invoke our supervisory authority over the administration of justice to direct our trial courts to refrain from using the ingenuity of counsel language in the future. Id., 475–76." (Citations omitted; internal quotation marks omitted.) *State* v. *Taft*, 57 Conn. App. 19, 28, 746 A.2d 813 (2000), aff'd, 258 Conn. 412, 781 A.2d 302 (2001).

In *Taft*, this court declined to reverse the defendant's conviction despite the fact that the trial court in that case had given an ingenuity of counsel instruction. The *Taft* court was persuaded by the facts that the trial court gave the improper instruction prior to *Delvalle*'s direction and because, "when viewed in the context of the instructions as a whole, [the improper instruction] could not have misled the jury." Id. The present case is distinguishable from *Taft* because the court gave the challenged instruction in this case after *Delvalle*'s direction.

The issue that presents itself is whether this directive by our Supreme Court, issued pursuant to its supervisory powers, requires an automatic reversal when not followed in a criminal matter. We conclude that it does not and, under the particular circumstances of this case, we deem reversal to be inappropriate. Although the court committed a flagrant, albeit unintentional, violation of the clear directive, we conclude that the fairness and integrity of the proceedings have not been affected and that no manifest injustice has occurred.

Because we need not adhere to a per se requirement of reversal in this circumstance, our standard of review is as it is for any other nonconstitutional challenge to a court's instruction. We ask whether it is reasonably possible that the jury was misled. Id., 29.

"In determining whether it was . . . reasonably possible that the jury was misled by the trial court's instruc-

tions, the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding them to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied . . . is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Citation omitted; internal quotation marks omitted.) *State* v. *Respass*, 256 Conn. 164, 182, 770 A.2d 471, cert. denied, 534 U.S. 1002, 122 S. Ct. 478, 151 L. Ed. 2d 392 (2001).

Our Supreme Court noted that the use of the "ingenuity of counsel" language did not constitute plain error but that the phrase when "taken in isolation, conceivably could misdirect the jury's attention . . . ." (Internal quotation marks omitted.) *State* v. *Delvalle*, supra, 250 Conn. 475. Our review of the court's instruction leads us to conclude that the court did not use the phrase in isolation. Read as a whole, the instruction described a reasonable doubt as a real doubt which has its foundation in the evidence or lack of evidence. The court modified the phrase "ingenuity of counsel" with the phrase "or any of your fellow jurors which is not justified by the evidence or lack of evidence in this case." See *State* v. *O'Neil*, 67 Conn. App. 827, 837, 789 A.2d 531 (2002). While the defendant in the present case, as did the defendant in *O'Neil*, did not specifically agree to the court's use of the contested language, the defendant failed to raise this specific issue at trial, thereby acquiescing at least implicitly, in the instruction.

As we have stated, "[a]lthough we do not condone the trial court's use of the 'ingenuity of counsel' language in its explanation to the jury, which occurred after the *Delvalle* decision was published, the defendant failed to raise that issue at trial." Id. We conclude as we did in *O'Neil* that although the court should have avoided the language in question, the instruction given did not affect the fairness or integrity of the proceedings or result in a manifest injustice to the defendant.

## II

The defendant next claims that the court improperly admitted irrelevant and prejudicial hearsay testimony from two of the state's witnesses, relating to the reasons the victim decided to go to Connecticut during the summer of 1998. We disagree.

The following additional facts are relevant to the defendant's claim. Prior to the state's direct examination of Janice Stephens, the victim's daughter, the defendant's counsel expressed his concerns that the state intended to elicit hearsay testimony from her. The prosecutor responded that he intended to question Stephens as to why her father decided to travel to Connecticut and live with the defendant. The prosecutor indicated that any statements that the victim may have made to Stephens regarding his intent to go to Connecticut or the reasons why he intended to do so were admissible as statements of the victim's then existing mental condition. The prosecutor argued that the court would be free to instruct the jury that the statements were not being offered as proof that the victim's statements were true, but that they were relevant as proof of the victim's mental condition, his then existing state of mind. The defendant's counsel argued that, while the victim's statements to Stephens in regard to his intent to travel to Connecticut were admissible, statements in regard to the reasons why he desired to do so were hearsay.

The court ruled that the victim's statements to Stephens as to his intent to stay with the defendant and the reasons underlying that intent were not hearsay because they reflected his mental state. The court noted: "[The victim] was saying something that ultimately resulted in a subsequent act. That clearly falls outside the hearsay provisions of the code [of evidence] . . . ." The court further observed that such testimony was admissible as evidence as to what the victim intended to do and why he intended to do it, not for the truth of the victim's assertions.

Over the defendant's objection, Stephens testified that the victim told her that he was traveling to Connecticut because he had concerns for his sister's affairs, that he would "try and gain control of her affairs to make sure that their business was handled properly and that she got everything that she needed." Before he left New York, the victim told Stephens that he "believed that some of [his sister's] money was being tampered with and that he . . . had to make sure that the tampering stopped." He also indicated that the defendant caused him to have such concerns.

The state elicited similar testimony from Renona Pryor, an intimate acquaintance of the defendant. Over the defendant's objection on the ground of hearsay, the state introduced similar testimony that the court deemed admissible as relevant evidence of the victim's then existing mental condition. Specifically, Pryor testified that she spoke with the victim after he had arrived in Connecticut. She testified that the victim said that "[h]e was concerned with how [the defendant] was handling his sister's affairs, her money affairs."

"Our standard of review concerning evidentiary rulings is well settled. It is a well established principle of law that the trial court may exercise its discretion with regard to evidentiary rulings, and the trial court's rulings

will not be disturbed on appellate review absent abuse of that discretion. . . . Sound discretion, by definition, means a discretion that is not exercised arbitrarily or wilfully, but with regard to what is right and equitable under the circumstances and the law. . . . And [it] requires a knowledge and understanding of the material circumstances surrounding the matter. . . . In our review of these discretionary determinations, we make every reasonable presumption in favor of upholding the trial court's ruling." (Internal quotation marks omitted.) *State* v. *Paris*, 63 Conn. App. 284, 290, 775 A.2d 994, cert. denied, 257 Conn. 909, 782 A.2d 135 (2001).

The defendant first argues that the court should have excluded the testimony as being irrelevant. "The challenged [e]vidence is relevant if it has a tendency to establish the existence of a material fact. . . . Relevant evidence is evidence that has a logical tendency to aid the trier [of fact] in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative. . . . No precise and universal test of relevancy is furnished by the law, and the question must be determined in each case according to the teachings of reason . . . ." (Citations omitted; internal quotation marks omitted.) Id., 292–93.

The defendant also claims that the statements were hearsay. "An out-of-court statement offered to prove the truth of the matter asserted is hearsay and is generally inadmissible unless an exception to the general rule applies." *State* v. *Hines*, 243 Conn. 796, 803, 709 A.2d 522 (1998). The law recognizes, however, an exception for statements of a then existing mental or emotional

condition.[5] "An out-of-court statement is not hearsay . . . if it is offered to illustrate circumstantially the declarant's then present state of mind, rather than to prove the truth of the matter asserted." (Internal quotation marks omitted.) *State* v. *Wideman*, 36 Conn. App. 190, 195, 650 A.2d 571 (1994), cert. denied, 232 Conn. 903, 653 A.2d 192 (1995).

We conclude that the testimony of the witnesses did not constitute hearsay because the state did not offer it to prove the truth of the assertions therein, but rather to show the victim's state of mind and his reasons for going to Connecticut. Furthermore, this state of mind evidence was relevant to the issue of the defendant's motive and intent. As our Supreme Court has stated, "[w]hether the victim's state of mind is relevant depends . . . on the nature of the issues at trial. . . . [E]vidence of a victim's mental state may be relevant to establish the defendant's motive to kill the victim." (Citation omitted; internal quotation marks omitted.) *State* v. *Wargo*, 255 Conn. 113, 138, 763 A.2d 1 (2000). The court here appropriately noted that the victim's statements as to why he intended to go to Connecticut to investigate the defendant's handling of his sister's financial affairs was as relevant as any evidence "could be" to this case.

Finally, the defendant argues that the court should have excluded the testimony because it was unduly prejudicial. "Although relevant, evidence may be excluded by the trial court if the court determines that the prejudicial effect of the evidence outweighs its probative value. . . . Of course, [a]ll adverse evidence is

---

[5] Connecticut Code of Evidence § 8-3 (4) excludes from the rule against hearsay "[a] statement of the declarant's then-existing mental or emotional condition, including a statement indicating a present intention to do a particular act in the immediate future, provided that the statement is a natural expression of the condition and is not a statement of memory or belief to prove the fact remembered or believed."

damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury. . . . The trial court . . . must determine whether the adverse impact of the challenged evidence outweighs its probative value. . . . Finally, [t]he trial court's discretionary determination that the probative value of evidence is not outweighed by its prejudicial effect will not be disturbed on appeal unless a clear abuse of discretion is shown. . . . [B]ecause of the difficulties inherent in this balancing process . . . every reasonable presumption should be given in favor of the trial court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." (Citations omitted; internal quotation marks omitted.) *State* v. *Copas*, 252 Conn. 318, 329–30, 746 A.2d 761 (2000).

As we have stated, the court properly concluded that the challenged evidence was highly relevant to the issues of motive and intent. We conclude that the testimony did not improperly arouse the jurors' emotions. We also recognize that the court properly instructed the jury to consider the testimony only for its limited purpose, as evidence relating to the issue of motive, not for the truth of the victim's assertions.[6] "It is to

---

[6] The court stated: "In this case, you have heard testimony from witnesses describing the statements that [the victim] allegedly made that relate to his reasons in coming to Connecticut . . . . The state offered this type of testimony as evidence of [the victim's] state of mind. The state did not offer that evidence . . . to establish the truth, the accuracy or validity of whatever [the victim] thought at the time he made the statements. If you find that [the victim] made the statement attributed to him, you may use that fact only to determine whether [he] later acted consistently with his earlier declared state of mind. However, you may not use the beliefs or opinions he stated as evidence of the truth, accuracy or factual correctness of his beliefs."

be presumed that the jury followed the court's . . . instructions unless the contrary appears." (Internal quotation marks omitted.) *State* v. *McIntyre*, 250 Conn. 526, 533, 737 A.2d 392 (1999). Accordingly, we conclude that the court did not abuse its broad discretion in permitting the state to bring this relevant evidence before the jury.

## III

The defendant also claims that the court improperly admitted evidence of the victim's attempt to file a complaint with the police. We disagree.

The following additional facts are relevant to this claim. During its case-in-chief, the state elicited testimony from Patrick Freer, a police officer from the town of Stratford. Freer testified that, on June 25, 1998, he responded to a call from the victim, who desired to file a complaint against the defendant. The victim informed Freer that his sister was hospitalized, that the defendant had a power of attorney over her affairs and that he believed, based at least in part on the representations of others, that the defendant was "using her money for his own personal use." The victim sought to have the police department intervene and give him a power of attorney for his sister. Freer testified that he informed the victim that the police department could not intervene on his behalf because the victim's complaint dealt with a civil matter.

The defendant's counsel timely sought to preclude this testimony. He argued that the testimony was irrelevant because the victim's state of mind was not at issue in the case, that the testimony was hearsay and that the testimony was prejudicial. The court ruled that the testimony was relevant to the issue of the defendant's motive in committing the crimes and that it was not hearsay because it constituted statements of the victim's then existing emotional or mental state.

The standard of review and the legal principles set forth in part II of this opinion apply as well to this claim. For the same reasons as we discussed in part II of this opinion, we conclude that the court properly admitted this testimony. Freer's testimony directly related to the victim's state of mind, his mental condition as it related to the relationship between himself and his nephew, the defendant. As such, it was powerful evidence as to the issue of the defendant's motive. Likewise, given its probative value, we do not conclude that the court abused its discretion when it permitted Freer to relate the details of his meeting with the victim.[7]

The judgment is affirmed.

In this opinion the other judges concurred.

---

[7] We also observe that the court properly instructed the jury to consider Freer's testimony solely as to the issue of the victim's then existing state of mind, not to consider as true the victim's complaint.