# STATE OF CONNECTICUT *v.* RINALDO FLEURY
# (AC 32183)

Lavine, Alvord and Flynn, Js.

Argued January 31—officially released May 22, 2012

*Michael Zariphes*, special public defender, for the appellant (defendant).

*Adam E. Mattei*, special deputy assistant state's attorney, with whom, on the brief, were *John C. Smriga*, state's attorney, and *C. Robert Satti, Jr.*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

ALVORD, J. The defendant, Rinaldo Fleury, appeals from the judgment of conviction, rendered after a jury trial, of illegal sale of a pistol or revolver in violation of General Statutes § 29-33 (c) and carrying a pistol or revolver without a permit in violation of General Statutes § 29-35. On appeal, the defendant claims that (1) the trial court violated his constitutional right to an impartial jury when it improperly severed the charges alleged in the original four count information and (2) the state failed to provide sufficient evidence that the defendant committed the crimes for which he was convicted. We disagree with the defendant and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. Detective Arthur Huggins of the Milford police department had been working in an undercover capacity as part of a federal Drug Enforcement Administration (administration) investigation led by Agent Dana Mofenson. In his undercover role, Huggins had been communicating with Scott Similien and had met with

him approximately a dozen times. On June 27, 2008, Huggins arranged to purchase a handgun from Similien and told Similien that he believed that he would be able to resell the handgun at the Pilot truck stop in Milford. After speaking by cell phones, Huggins and Similien agreed to meet on Linwood Avenue in Bridgeport for the exchange. Similien and Huggins agreed on a price of $500. The administration provided Huggins with $500 divided into five bundles of $100 each in varying denominations. In anticipation of the meeting, Mofenson positioned agents and Milford police detectives in six or seven unmarked cars around the Linwood Avenue area. The officers and agents were equipped with binoculars with which to view Similien and any other persons accompanying him for the transaction.

At approximately 5:45 p.m., Huggins parked his truck on Linwood Avenue to wait for Similien to arrive with the gun. Huggins had two different recording devices in his vehicle, a Kel monitoring device and a digital recorder. One recording device was located in the dashboard of the truck and the other was attached to the sun visor on the driver's side of the vehicle. Huggins would speak into the Kel monitoring device in order to communicate with the other members of the investigation team prior to the transaction. He also communicated with Mofenson via cell phone.

Later that afternoon, a black 1998 Infiniti sedan bearing license plate number 558UZP pulled up on the left side of Huggins' truck, in the middle of the road. Huggins stated aloud the license plate number of the Infiniti for the benefit of the other team members who could hear him over the Kel device. Similien exited the Infiniti and came up to the driver's side door of Huggins' truck. Another person later identified as the defendant exited the Infiniti and came around to the passenger side, opening the door. A third man later identified as Fritze Dorce stayed in the driver's seat of the Infiniti with the

engine idling. Special Agent Rodney George had a clear view of the transaction and the defendant through his binoculars. Huggins provided the money to Similien as the defendant took a brown bag from the waistband of his pants, throwing the bag on the passenger seat of Huggins' truck. Huggins picked up the bag, looked inside, saw the gun and told Similien and the defendant, "it looks good." The brown bag contained a .22 caliber handgun which laboratory tests later showed was fully operational.

During the exchange, the defendant, Similien and Huggins had a brief conversation at which time their voices were caught on the recording devices in Huggins' truck. While speaking to the defendant, Huggins noticed a green tattoo featuring lettering on the left side of the defendant's neck. Similien and the defendant then returned to the Infiniti which drove to the end of the street and turned left. Huggins brought the handgun in the brown bag to Mofenson and then entered George's vehicle.

Special Agent Daniel Dobas followed the Infiniti as it turned left on Norman Street, as it turned left on Beechwood and then as it turned left on Wood where it stopped at 5 Elmwood, an address that the agents had monitored many times before. None of the three men exited the Infiniti at 5 Elmwood, but a man identified as Junior Etienne came out of the house and approached the vehicle on the passenger side. Dobas continued to follow the Infiniti after it left 5 Elmwood and continued to 123 Center Street, another location that the agents had been monitoring. None of the men exited the Infiniti at that location and no one entered the vehicle. The Infiniti then drove up Center Street toward Washington Avenue.

Dobas used a two-way radio to communicate with Bridgeport police Officer Jason Amato, who was in an

unmarked police car on the east side of Bridgeport, and asked Amato to stop the Infiniti. Amato crossed the East Washington Bridge and observed the Infiniti traveling from Center Street onto Washington Avenue. Amato followed the Infiniti as it proceeded onto Main Street and, after the Infiniti failed to use a turn signal, Amato stopped the vehicle at the VIP Car Wash on Main Street.

After it was confirmed that the vehicle had been stopped, George and Huggins drove past the car wash. On the basis of this drive-by viewing, Huggins identified the car and the men as those involved with the gun sale. It was sunny that afternoon, so Huggins was able to get a good view of Similien and the defendant standing outside the vehicle at the car wash. Amato recognized all three of the men in the Infiniti, including the defendant, but also viewed each man's state issued identification card. Amato then allowed the vehicle to leave the scene. The police later secured a warrant for the defendant's arrest, and he arranged with the police to turn himself in. At no time did the defendant ever apply for or possess a permit to carry a pistol nor is there any record that he ever applied to the state for permission to sell a pistol.

The state charged the defendant in a four count information with violation of the Corrupt Organizations and Racketeering Activity Act (act) pursuant to General Statutes § 53-395 (c),[1] conspiracy to violate the state dependency producing drug laws pursuant to General Statutes §§ 53a-48, 21a-277 (a) and 21a-279 (a), illegal sale of a pistol or revolver in violation of § 29-33 (c) and carrying a pistol or revolver without a permit in violation of § 29-35. On November 16, 17 and 18, 2009,

[1] The charges under the act were related to the defendant's alleged violation of the state's dependency producing drug laws pursuant to General Statutes §§ 21a-278 (b) and 21a-277 (a).

the state and the defendant conducted voir dire. During voir dire, the court informed the venirepersons that the trial would be held December 14 through 18, 2009, and would not interfere with the holidays. All four counts of the information were read to the venirepersons and the venirepersons heard mention of the Stack Boys, a gang to which the defendant allegedly belonged.

Due to a prior trial that lasted longer than expected, however, the court was not able to commence the trial until December 16, 2009. On the day before trial began, the court sua sponte determined that severing the charges and holding separate trials for the gun charges and drug charges would ensure that the jury selected in November would be able to hear at least one trial in its entirety. At least two of the jurors were not able to continue service beyond the original time represented to them by the court. The defendant had filed a speedy trial motion, and the court expressed the belief that severing the charges was the only way to ensure that at least one of the trials would be concluded before the end of the year.

The state objected to severance, arguing that the conspiracy was the reason that the defendant was involved in the gun sale. Defense counsel stated that he approved of severance because it would avoid any spillover prejudice between the gun and drug charges. Defense counsel noted, however, that the defendant himself objected to severance. Defense counsel told the court: "As the defense counsel in this matter who is charged with the responsibility of defense trial strategy, I can tell the court that I, the defense has no objection to bifurcation and is in favor of it for reasons in addition to what the court indicated but for principal reasons to attempt to preclude spillover prejudice. I've explained this to [the defendant]. [The defendant] on the other hand wants to have everything tried together. . . . I've explained

to him, however that—at the beginning of my representation of him, I told him that there are about two things or three things he absolutely controls; whether to plead guilty or not, whether to have a jury election or whether or not to testify. I also explained to him that within the confines of our legal system, since I determine trial strategy in the matter that I thought that bifurcation would be in his best interest. And so as a consequence of that or in conclusion, I'm telling the court that even though [the defendant] doesn't agree with me, the defense, on the other hand, believes that bifurcation is the best way to proceed."

The court then explained to the defendant why it would be severing the charges because the defendant told the court he did not understand the purpose of the severance. The defendant continued to object to severance despite the court's explanation and his counsel's approval. The court then severed the charges and granted the defendant's motions in limine to preclude evidence that the defendant was in the Stack Boys gang or that he was involved in any drug sales.

Following severance of the charges, the court gave the following instruction to the jury regarding the amended information: "So the defendant has been charged in the following information. This information's a little different than the one that I think was presented to you at the time of jury selection. There were I think four counts. We're going to go to trial on two counts here which I'm going to read to you right now. So don't worry about those other counts. Just—your job is to concentrate on the two counts alleged in this trial." The court also informed the jury: "The information itself is not evidence of guilt and you should draw no inference of guilt because a defendant has been charged with these two offenses."

Following the trial, the jury convicted the defendant of both counts of the amended information, including

illegal sale of a pistol or revolver in violation of § 29-33 (c) and carrying a pistol or revolver without a permit in violation of § 29-35. The court sentenced him to four years in prison. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant claims that the trial court violated his constitutional right to an impartial jury when it improperly severed the proceedings because he personally objected to severance. We disagree and conclude that the defendant's argument is without merit because the defendant did not have a right to decide whether or not the trial would be severed.[2]

"Our rules of practice allow a trial court to order, sua sponte or upon motion of the defendant, a separate trial of two offenses if it appears that the defendant is prejudiced by the joinder of the offenses. See Practice Book § 41-18 . . . ." (Internal quotation marks omitted.) *State* v. *Thompson*, 81 Conn. App. 264, 284, 839 A.2d 622, cert. denied, 268 Conn. 915, 847 A.2d 312 (2004). "In deciding whether to sever informations joined for trial, the trial court enjoys broad discretion, which, in the absence of manifest abuse, an appellate

---

[2] We also conclude that the defendant did not suffer prejudice from the decision of the trial court to sever the charges. The defendant argues that he was prejudiced because the jury heard the court read the original four count information during voir dire. This argument fails because if the charges had not been severed, far more prejudicial information such as the state's evidence that the defendant was involved in more than sixty drug transactions as part of a conspiracy would have been admitted into evidence. Defense counsel's agreement with the severance was based on his position that severance would prevent prejudice and this strategy was successful because counsel then prevailed on his motion in limine to preclude any mention of drugs in the trial on the gun charges. The court instructed the jury to concentrate only on the two counts of the gun charges when the trial began. "In the absence of a showing that the jury failed or declined to follow the court's instructions, we presume that it heeded them." *State* v. *Reynolds*, 264 Conn. 1, 131, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004).

court may not disturb." (Internal quotation marks omitted.) *State* v. *Bell*, 93 Conn. App. 650, 654, 891 A.2d 9, cert. denied, 277 Conn. 933, 896 A.2d 101 (2006).

The issue of severance is one of trial tactics, not one of constitutional magnitude and not one over which the defendant personally had the right to make the final determination. See, e.g., *State* v. *Berube*, 256 Conn. 742, 747–49, 775 A.2d. 966 (2001). "The fundamental rights that a defendant personally must decide to waive are . . . distinguishable from tactical trial rights that are not personal to the defendant and that counsel may choose to waive as part of trial strategy." *State* v. *Gore*, 288 Conn. 770, 778–79, 955 A.2d 1 (2008). "It is . . . recognized that the accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal . . . . However, [o]nce counsel is appointed, the day-to-day conduct of the defense rests with the attorney. He, not the client, has the immediate—and ultimate—responsibility of deciding if and when to object, which witnesses, if any to call, and what defenses to develop. Not only do these decisions rest with the attorney, but such decisions must, as a practical matter, be made without consulting the client." (Citations omitted; internal quotation marks omitted.) *State* v. *Stewart*, 64 Conn. App. 340, 352, 780 A.2d 209, cert. denied, 258 Conn. 909, 782 A.2d 1250 (2001), quoting in part *State* v. *Davis*, 199 Conn. 88, 95, 506 A.2d 86 (1986). "It is well established that [w]e may assume with confidence that most counsel, whether retained or appointed, will protect the rights of an accused." (Internal quotation marks omitted.) *State* v. *Stewart*, supra, 353.

Counsel in this case made the tactical decision that severance of the drug and gun charges was in the best interest of the defense. "[H]aving made the knowing, intelligent and voluntary choice to avail himself of the

services of counsel, a defendant necessarily surrenders to that counsel the authority to make a wide range of strategic and tactical decisions regarding his case. . . . Absent a demonstration of ineffectiveness, counsel's word on such matters is the last." (Citation omitted; internal quotation marks omitted.) *State* v. *Rivera*, 129 Conn. App. 619, 630, 22 A.3d 636, cert. denied, 302 Conn. 922, 28 A.3d 342 (2011). The defendant's personal disagreement with the tactical decisions of counsel is therefore not relevant to our analysis; *State* v. *Stewart*, supra, 64 Conn. App. 353–54; because there is no right to hybrid representation in this state. *State* v. *Gethers*, 197 Conn. 369, 382–94, 497 A.2d 408 (1985). Thus, the defendant's argument fails.

## II

The defendant next claims that the state failed to proffer sufficient evidence to establish the element of identity. We disagree.

In reviewing sufficiency of the evidence claims, we apply a two part test. "First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . While . . . every element [must be] proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the

cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Jennings*, 125 Conn. App. 801, 805–806, 9 A.3d 446 (2011). "On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) *State* v. *Rodriguez*, 93 Conn. App. 739, 749, 890 A.2d 591 (2006), appeal dismissed, 281 Conn. 817, 917 A.2d 959 (2007).

The jury heard four law enforcement officials make in-court identifications of the defendant and testify that the defendant, along with Similien and Dorce, was involved in the gun sale with Huggins. Huggins testified that he identified the defendant outside the car wash after the gun sale as the same person who put the brown bag on the passenger seat of his truck. Huggins also testified that he saw the defendant's green neck tattoo, and the jury was provided with photographs of the defendant including a tattoo matching the description provided by Huggins. Dobas testified that he followed the Infiniti from the scene of the gun sale to ensure that the passengers were the same men involved in the gun sale, only allowing the vehicle out of his sight for about five minutes before it was stopped by Amato at the car wash. George testified that he saw the defendant get out of the car and walk toward the passenger side of Huggins' truck. Mofenson testified that he saw the defendant at the car wash.

Additionally, Amato's testimony was particularly strong. Amato testified that when he pulled the Infiniti over at the car wash, he not only recognized the defendant based on prior encounters, but that he had seen the defendant in combination with the other passengers of the Infiniti on several other occasions. In fact, Amato

testified that he saw the defendant and Dorce in the exact same Infiniti with the same license plate number, 558UZP, one month after the incident. Furthermore, at the time he stopped the Infiniti at the car wash, Amato viewed the defendant's state identification card only minutes after the defendant had engaged in the gun sale transaction with Huggins and directly after Dobas tailed the Infiniti from the scene of the crime until he called for Amato to stop the car.

The state's evidence establishing the defendant's identity was overwhelming. The jury reasonably could have concluded that the passengers of the Infiniti at the time Amato stopped the vehicle at the car wash were the same passengers who had only minutes before been involved in the gun sale with Huggins. Moreover, Huggins himself drove by the car wash to ensure that the passengers were the same and he conveyed that information to the surveillance team. Accordingly, there was sufficient evidence for the jury reasonably to conclude that the defendant was involved in illegally selling the gun to Huggins.

The judgment is affirmed.

In this opinion LAVINE, J., concurred.

FLYNN, J., concurring. The right to a speedy trial is a civil liberty that is among the core fundamental rights protecting us as a free people. U.S. Const., amend. VI; Conn. Const., art. I, § 8; *Klopfer* v. *North Carolina*, 386 U.S. 213, 223, 87 S. Ct. 988, 18 L. Ed. 2d 1 (1967). Although gained through a revolution, this right needs to be honored and protected if it is to survive as something of substance rather than a hobbled, hollow promise.

Although the defendant, Rinaldo Fleury, was represented by counsel while incarcerated and awaiting trial,

the defendant filed his own motion for speedy trial with the trial court on November 4, 2009, "[p]ursuant to [General Statutes] § 54-82m . . . article first, [§] 8, of the Connecticut constitution and, the sixth and four-teenth amendment[s] to the United States constitution." Jury selection then began both on his pending gun and narcotics charges. The court told the defendant that the reason he was receiving a speedy trial was because he "filed a motion with the court."

For the convenience of trial, the court permitted the joinder of the separate gun[1] and narcotics[2] offenses in one information. After the completion of jury selection, as trial was about to commence, however, the court, on its own motion, severed the charges, announcing that the current trial would be on only the gun charges. The defendant's counsel agreed to the severance, but the defendant did not agree, claiming on the record that the delay caused by a later, separate trial on the narcotics charges would result in his incarceration for a longer period of time while he awaited trial on the severed narcotics charges. Although the defendant did not use magic words citing the particular constitutional sections guaranteeing a speedy trial when he addressed the court and objected to severance of the charges, I have no trouble understanding his objection to the severance as his assertion of a right to a speedy trial, which he already had requested and which the court had recognized previously.

As of the date of argument of this appeal, trial still had not commenced on the severed narcotics charges.

---

[1] Illegal sale, delivery, or otherwise transfer of a pistol or revolver, General Statutes § 29-33, and carrying a pistol or revolver without a permit, General Statutes § 29-35 (a).

[2] Conspiracy to sell and conspiracy to possess hallucinogenic substances/narcotics, General Statutes §§ 53a-48, 21a-277 (a) and 21a-279 (a); violation of the Corrupt Organizations and Racketeering Activity Act, General Statutes § 53-395, by commission of predicate acts in violation of General Statutes §§ 21a-278 (b) and 21a-277 (a).

The majority holds that the defendant, while represented by a lawyer, could not object to the narcotics charges being severed. They reason that, once represented, this right to object was his counsel's, not his, and that his counsel could and did waive this right for tactical reasons, and, therefore, the defendant's objection to the court's severance of some charges could not serve to preserve the issue of the effect of that severance for appeal. I disagree.

The case of *State* v. *Berube*, 256 Conn. 742, 747–49, 775 A.2d 966 (2001), cited by the majority as authority for its position, is factually inapposite. In that case, there was a joint trial of two separate informations, no severance and no objection by counsel or the defendant to the joinder. Id., 744, 746–48. On the contrary, in this case, the defendant did object to severance, and the jury already had been selected to hear the joined charges. The court made no finding that a waiver of the right to a speedy trial had occurred.

I know of no decision by our Supreme Court or the United States Supreme Court holding that, when a jury has been picked and trial is about to begin because of a speedy trial motion on cases already joined for trial, a represented defendant has no right to object on the record to severance of one of two informations containing some of the charges, himself, despite his counsel's agreement to sever them. Nor am I pointed to any such authority holding that, under these circumstances, any claims arising out of the severance have been waived on a defendant's behalf by his counsel's actions, when the court fully was aware of the defendant's objection.

The circumstances of this case do not warrant deciding so for the first time. I therefore would review, not just one, but both of the defendant's claims on appeal.

Under the procedural history of this case, the severance of the pending charges, over the defendant's objection, or "bifurcation" as the parties inartfully call it in their briefs, leads to one functional result.[3] Trial was delayed on the narcotics charges that the jury heard about in voir dire for the gun case actually tried. I would regard the propriety of the severance and its effect on the gun counts actually tried as preserved. On appeal, the defendant is constrained because the case he did not want severed is not before us on appeal. We deal only with the case that was appealed. The defendant's claims on appeal are that there was insufficient evidence to show his identity as the perpetrator of the crimes and that the trial court abused its discretion and correspondingly violated his right to a fair trial when it untimely and improperly "bifurcated" the narcotics and gun charges after the jury already had been selected and told about the existence of the narcotics charges during the jury selection process.

As to the insufficiency claim, it really amounts to a claim that the evidence presented on identity was not credible. I would reject that argument. It was the jury's function to determine what evidence to credit and, if believed, the evidence presented sufficed to support the verdict. *State* v. *Feliciano*, 74 Conn. App. 391, 397, 812 A.2d 141 (2002), cert. denied, 262 Conn. 952, 817 A.2d 110 (2003). I agree with the majority's comprehensive analysis on this issue.

Finally, as to the charges on which the defendant actually was tried, his claim is that, to his prejudice, during voir dire jury selection, the jury was apprised of narcotics charges that were subsequently severed

---

[3] The term "bifurcation" normally is used where one case is split into multiple parts. For example, a jury deliberates on liability and, after determining that liability exists, subsequently determines damages. Here, two separate cases were joined for trial, gun charges and narcotics charges, and severance is the appropriate term.

and were not heard during this trial. I would reject this claim also. Whatever the wisdom of the severance of the narcotics charges, the defendant in the gun case was in no worse position than anyone charged with multiple counts when, after the state and the defendant have rested, a court "charges out" of the jury's consideration any counts on which there is no evidence as to some, one, or more essential elements of a crime. In such situations, we do not reverse the convictions that were obtained because the jury heard about criminal charges in voir dire that ultimately were charged out of the jury's consideration. Nor should we here.

As the state notes, it is also difficult to see how there was any overall prejudice to the defendant in the trial on the gun charges as a result of the severance of the narcotics charges, because the severance obviated the need to present actual evidence in the gun trial that the defendant was involved in numerous narcotics transactions.

Thus, after review of both claims on appeal, I would affirm the judgment of conviction. Accordingly, I concur.