******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* SANTOS CANCEL
(AC 34639)

Lavine, Keller and Schaller, Js.

*Argued October 17, 2013—officially released April 1, 2014*

(Appeal from Superior Court, judicial district of
Waterbury, O'Keefe, J.)

*William B. Westcott*, assigned counsel, for the appellant (defendant).

*Margaret Gaffney Radionovas*, senior assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *Terence D. Mariani, Jr.*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SCHALLER, J. The defendant, Santos Cancel, appeals from the judgments of conviction, following a jury trial, in the first case, of sexual assault in the fourth degree in violation of General Statutes § 53a-73a (a) (1) (A), risk of injury to a child in violation of General Statutes § 53-21 (a) (1), and risk of injury to a child in violation of § 53-21 (a) (2), and, in the second case, of sexual assault in the fourth degree in violation of § 53a-73a (a) (1) (A), risk of injury to a child in violation of § 53-21 (a) (1), and risk of injury to a child in violation of § 53-21 (a) (2). On appeal, the defendant claims that (1) the evidence was insufficient to support his conviction in the second case, and (2) the trial court improperly joined the two cases for trial. We affirm the judgments of the trial court.

The jury reasonably could have found the following facts with respect to the charges in the first case, which involved the victim, J.[1] J was eleven years of age in February, 2009, and resided with her uncle. J's mother resided with the defendant and three of J's maternal siblings, all minors, in a nearby city. Sometime in February, 2009, J went to her mother's residence for an overnight visit. J's mother, the defendant, and the three other children were present in the residence during J's stay. On the night of her visit, J went to sleep in her sisters' room, where she shared a bed with two of her siblings. J later awoke to find the defendant sitting on the floor touching her "front private area." When the defendant realized that J was awake, he apologized to her. J's mother then called for the defendant, prompting him to leave the room. Later that night, the defendant returned to the bedroom. He woke J and instructed her to go to another bedroom in the residence. J proceeded to go into the other bedroom, alone, and went back to sleep. The defendant then entered the other bedroom. He shut the door, positioned himself on top of J and "went up and down." The defendant then cut a hole in J's underwear and initiated sexual contact with J's intimate areas. Following her encounter with the defendant, J went into the bathroom and felt a "wet" sensation in and around her intimate parts.

The next day, J returned to her uncle's home crying and ostensibly nervous. Sometime later, J told her uncle's girlfriend that she was having "a problem." J explained how the defendant had "told her to go to sleep and to lay . . . face down," and how he had cut her pants. J also told her uncle that the defendant had tried to "abuse her" the night she stayed at her mother's home. J's uncle subsequently contacted the social worker at J's school. The social worker met with J, and J explained what occurred on the night she stayed at her mother's residence. After meeting with J, the social worker reported the incident to the Department of Children and Families (department). The department, in

turn, contacted the police. Thereafter, J and her uncle went to the police station where J explained to the police how the defendant had made inappropriate contact with her on the night she stayed at her mother's residence. The police subsequently initiated an investigation into the incident and sought out J's mother and the defendant for questioning. When the police arrived at the mother's residence, the defendant ran out the back door. J's mother, however, agreed to accompany the police to the station for questioning. During questioning, J's mother indicated that during J's most recent visit, J had told her that she woke up with holes in her underwear. J's mother also indicated that one of her other daughters had reported waking up with holes in her underwear on several occasions.

The jury reasonably could have found the following facts with respect to the charges in the second case, involving the victim, G. G was ten years of age in February, 2009, and one of J's siblings. G lived with her mother and the defendant on a permanent basis. After speaking to her mother in connection with J, the police questioned G. G told the police that on certain nights, the defendant would come into her room and tell her to change her sleeping position. In the mornings that followed the defendant's nighttime visits, G woke up to find holes in her underwear and pants, always in the vicinity of her intimate areas. These holes were never present when she went to sleep, but appeared after she woke up the next morning. She was uncertain of what caused the holes to appear, but believed that her cat caused the holes in her clothing because her cat previously had ripped holes in her sister's clothing. She explained that the holes in her clothing appeared only during the time the defendant lived in the residence. She usually would give the underwear to her mother so she could mend them or throw them away. G revealed to police that she was wearing a pair of the mended underwear during questioning and that the dresser at her mother's residence contained many pairs of the underwear that still had holes in them or had been mended by her mother. With the mother's permission, the police took possession of the underwear G wore at the time of questioning. The police subsequently obtained and executed a search warrant on the mother's residence. During the search, the police seized twelve additional pairs of underwear and two pairs of pants that either had holes in them or appeared to have been mended. In addition, the police seized two pairs of scissors. The thirteen pairs of underwear and two pants seized by the police subsequently were submitted for forensic analysis. The forensic analysis of the clothing revealed that the two pants and six out of the thirteen pairs of underwear had holes consistent with being cut by a sharp blade, not ripped. The holes in each item were located between the rear end and genital area. DNA analysis revealed that the defendant's semen was

present on the inside and outside of three pairs of G's underwear and one pair of her pants. The defendant could not be eliminated as the source of semen present on another pair of underwear.

The defendant was arrested on March 5, 2009.[2] With respect to J's case, the state, in a substitute information, charged the defendant with one count of attempt to commit sexual assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-70 (a) (2), one count of sexual assault in the fourth degree in violation of § 53a-73a (a) (1) (A), and two counts of risk of injury to a child in violation of § 53-21 (a) (1) and (2). With respect to G's case, the state, in a substitute information, charged the defendant with one count of sexual assault in the fourth degree in violation of § 53a-73a (a) (1) (A), and two counts of risk of injury to a child in violation of § 53-21 (a) (1) and (2).

Before trial commenced, the state moved for a consolidated trial on the charges in both cases. The court granted the motion after defense counsel raised no objection.

At the conclusion of evidence, the jury found the defendant not guilty of attempt to commit sexual assault in the first degree, but guilty on each of the remaining charges in J's case. The jury found the defendant guilty of all charges in G's case. The court sentenced the defendant to a total effective term of thirty years of imprisonment.[3] This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims that the evidence was insufficient to support his conviction of sexual assault in the fourth degree and risk of injury to a child with respect to G's case. The defendant contends that in reviewing this claim, we are limited to a review of the evidence presented as to G. Because our review is confined to evidence that is properly attributable to G's case, the defendant contends that the state did not establish that he had sexual contact with G and thereby failed to satisfy its burden of proving the charges with respect to G beyond a reasonable doubt. We disagree.

A

We begin by addressing the defendant's contention that we must disregard certain evidence presented at the consolidated trial for purposes of reviewing the sufficiency of the evidence for G's case. The defendant specifically contends that J's testimony was not admitted for any cross admissible purpose in G's case. Thus, according to the defendant, we cannot consider J's testimony in determining whether there was sufficient evidence to convict him of the charges with respect to G. We are not persuaded.

The following additional facts and procedural history

are necessary to resolve the defendant's contention with respect to the proper scope of our sufficiency analysis. The jury heard J's testimony one day prior to G's testimony. The defendant did not ask the court to instruct the jury about any limitations or specific purposes for which J's testimony could be used with respect to the charges in G's case.

In support of his contention that J's testimony cannot be considered in determining whether there was sufficient evidence to support the jury's verdict in G's case, the defendant directs our attention to *State* v. *Payne*, 303 Conn. 538, 34 A.3d 370 (2012). In *Payne*, our Supreme Court held that the trial court improperly joined a felony murder case and a jury tampering case. Id., 542–43. The state argued that the joinder should be affirmed "because the evidence in the two cases was cross admissible. . . . [E]vidence of jury tampering was admissible to show consciousness of guilt in the felony murder case." Id., 543 n.3. Our Supreme Court disagreed and concluded "that it would be inappropriate to affirm [the trial court's joinder] on the basis of cross admissibility where . . . the trial court did not admit the evidence [of jury tampering] for consciousness of guilt, and neglected to instruct the jurors regarding impermissible inferences that could be drawn from the joinder of the two cases, such as inferring the defendant's propensity to commit a crime. If the parties had been permitted to use the evidence for cross admissible purposes at trial, the trial court would have needed to instruct the jury regarding inferences that could not be drawn from such evidence." Id. The defendant argues that the foregoing rationale in *Payne* supports the proposition that, when analyzing a sufficiency claim arising from a consolidated trial, we may consider the evidence only for the limited purpose for which it was admitted. Accordingly, because J's testimony was not admitted for any cross admissible purpose, the defendant argues that it has "no legal import whatsoever" as to G's case.

Notwithstanding the defendant's reading of *Payne*, we are unable to discern any basis for his argument from that opinion. The issue in *Payne* was whether the *joinder* in the underlying criminal trial was proper, not whether sufficient evidence existed to support the jury's verdict. Id., 542. Nowhere in its opinion did our Supreme Court address the scope of the evidence that a reviewing court may consider for purposes of resolving a sufficiency claim on appeal from a consolidated trial. Moreover, the defendant's position squarely conflicts with the great weight of authority that commands us to review claims of evidentiary insufficiency in light of "*all of the evidence* [adduced at trial]." (Emphasis added; internal quotation marks omitted.) *State* v. *Morelli*, 293 Conn. 147, 153, 976 A.2d 678 (2009). In other words, "we review the sufficiency of the evidence as the case was tried . . . ." *State* v. *Smith*, 73 Conn. App. 173, 179–80, 807 A.2d 500, cert. denied, 262 Conn. 923, 812

A.2d 865 (2002); see also *State* v. *Rodriguez*, 39 Conn. App. 579, 593, 665 A.2d 1357 (1995) ("[o]ur review of a claim of insufficiency of the evidence encompasses all of the evidence adduced at trial"), rev'd on other grounds, 239 Conn. 235, 684 A.2d 1165 (1996). Accordingly, we have traditionally tested claims of evidentiary insufficiency "by reviewing no less than, and no more than, the evidence introduced at trial." (Internal quotation marks omitted.) *State* v. *Morelli*, supra, 153; see also *State* v. *Adams*, 139 Conn. App. 540, 550, 56 A.3d 747 (2012) (appellate review of evidentiary insufficiency claim incorporates all evidence, even inadmissible evidence, adduced at trial), cert. denied, 308 Conn. 928, 64 A.3d 121 (2013).

In sum, we conclude that the defendant's reliance on *Payne* is misplaced and that he cannot prevail on his claim regarding the limited scope of our sufficiency analysis.

B

We now address the defendant's claim that the evidence was insufficient to support his conviction with respect to G. Specifically, the defendant contends that evidence was insufficient to establish that he "subjected G to sexual contact or that he had sexual contact with [G's] intimate parts," both essential elements of the crimes with which he was charged. We are not persuaded.

Our standard of review for claims of insufficient evidence is well settled. "[W]e apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . [P]roof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) *State* v. *Holley*, 144 Conn. App. 558, 562–63, 72 A.3d 1279, cert. denied, 310 Conn. 946, 80 A.3d 907 (2013).

"[A]ny claim of [insufficient evidence] introduced to prove a violation of a criminal statute must necessarily begin with the skeletal requirements of what necessary elements the charged statute requires to be proved." (Internal quotation marks omitted.) *State* v. *Rose*, 112 Conn. App. 324, 328, 963 A.2d 68 (2009), aff'd, 305 Conn.

594, 46 A.3d 146 (2012). Accordingly, our first task is to analyze the relevant statutes.

First, for the jury to find the defendant guilty of sexual assault in the fourth degree in violation of § 53a-73a (a) (1) (A) with respect to G, the state had to prove beyond a reasonable doubt that (1) the defendant subjected G to "sexual contact," (2) G was under thirteen years of age, and (3) the defendant was two years older than G.[4] Second, for the jury to find the defendant guilty of risk of injury to a child in violation of § 53-21 (a) (1) with respect to G, the state had to prove beyond a reasonable doubt that (1) G was under sixteen years of age, and (2) the defendant "wilfully or unlawfully caus[ed] or permit[ted] [G] to be placed in such a situation that . . . [G's] health [was] likely to be injured or [G's] morals [were] likely to be impaired, or [that the defendant performed] any act likely to impair the health or morals of [G] . . . ." Finally, for the jury to find the defendant guilty of risk of injury to a child in violation of § 53-21 (a) (2) with respect to G, the state had to prove beyond a reasonable doubt that (1) G was under sixteen years of age, and (2) the defendant either had "contact with [G's] intimate parts" or subjected G "to contact with [the defendant's] intimate parts . . . in a sexual and indecent manner likely to impair [G's] health or morals . . . ."[5]

The defendant contends that the state failed to establish the element of sexual contact necessary to support his conviction with respect to G. Specifically, the defendant contends that the evidence merely establishes "that at some point G wore the underwear, at some point a hole was cut in them, and that at some point the defendant's semen was wiped on the underwear." In addition, the defendant contends that "[i]t is only after the state implores the jury to consider J's independent . . . testimony, together with the [evidence of the defendant's prior misconduct] from ten years earlier, that the state is able to prevail with an argument . . . that the defendant *must have* had sexual contact with G." (Emphasis in original.)

During trial, the parties stipulated that the defendant previously had been convicted of charges stemming from an incident where he engaged in sexual intercourse with a fourteen year old female. The court informed the jury of the parties' stipulation, and instructed it that the prior conviction was "offered to show that the defendant had an unusual disposition, that is, a sexual interest in children," and could consider it as evidence of motive. From this, the jury reasonably could have found that the defendant had a "propensity to engage in aberrant and compulsive criminal sexual behavior" with children. *State* v. *DeJesus*, 288 Conn. 418, 470, 953 A.2d 45 (2008), superseded in part after reconsideration by *State* v. *Sanseverino*, 291 Conn. 574, 579, 969 A.2d 710 (2009). The jury heard testimony from

J that the defendant entered her bedroom at night, cut a hole in her underwear, initiated sexual contact with her intimate parts, and that she felt a "wet" sensation in and around her intimate parts after her encounter with the defendant. From J's testimony, the jury reasonably could have found that the defendant derived sexual gratification from the particular act of cutting a hole in a child's underwear in order to initiate sexual contact with the child's intimate parts. See *State* v. *George A.*, 308 Conn. 274, 300, 63 A.3d 918 (2013) (sexually unique activities constitute virtual signature of defendant's propensity to engage in such activities).

The jury also heard testimony from G that the defendant entered her bedroom at night "[a]ll the time" and told her to sleep on her stomach instead of her back. G would then wake up with holes in her underwear or pants that corresponded to the area of her intimate parts. The jury heard specific testimony that these holes only appeared during the time period in which the defendant lived with G and that G's mother either mended the holes or discarded the clothing entirely. The jury heard expert testimony that, out of the fifteen mended items of clothing recovered from G's bedroom dresser and her person, the defendant's semen was found both inside and outside the area that corresponded to G's intimate parts on four of the items, and eight items contained holes that were created with a sharp blade.

In light of this evidence, the jury reasonably could have inferred that the defendant entered G's bedroom at night and cut holes in her underwear for purposes of sexual gratification, just as he did with JE. See *State* v. *Merriam*, 264 Conn. 617, 665–66, 835 A.2d 895 (2003) ("[i]t is the distinctive combination of actions which forms the signature or modus operandi of the crime . . . and it is this criminal logo which justifies the inference that the individual who committed the first offense also committed the second" [internal quotation marks omitted]). It also was reasonable for the jury to infer that the defendant, when he cut holes in the area of G's underwear corresponding to her intimate parts, made sexual contact with G's intimate parts for the purposes of sexual gratification. See *State* v. *Alberto M.*, 120 Conn. App. 104, 111, 991 A.2d 578 (2010) (in "determining whether sexual contact occurred, it is of no consequence . . . that the contact occurred through the victim's clothing rather than against her bare skin"). Moreover, the jury reasonably could have inferred that either depositing semen on a child's underwear or entering a child's bedroom as she slept at night for purposes of cutting her underwear constituted a situation likely to impair the morals of a child.

Construing the evidence in the light most favorable to sustaining the verdict, we conclude that the evidence was sufficient to support the defendant's conviction

with respect to G.

## II

The defendant next claims that the trial court abused its discretion when it granted the state's motion to join the two cases and thereby deprived him of his right to a fair trial under the due process clause of the federal constitution. U.S. Const., amend. XIV, § 1. The defendant concedes that trial counsel did not object to the state's motion for joinder, but requests that we review his unpreserved claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[6] The state, in response, argues that defense counsel waived any claim challenging the joinder of the two cases on appeal. Specifically, the state argues that defense counsel's statement that she did not object to joinder "amounted to an express agreement with the state's position that joinder was appropriate." We agree with the state.

The following additional facts and procedural history are necessary to resolve the defendant's claim. On December 1, 2009, the state filed a motion to join J's case and G's case. It was not until September 14, 2011, however, that the parties "discussed briefly" the motion in chambers. The following day, September 15, 2011, the parties addressed the motion before the trial court. The court noted that "counsel for the defendant indicated that there might not be a lot of argument on [the motion]." Defense counsel replied, "I don't have an objection, Your Honor. For my own reasons." The court then granted the motion. The parties did not raise the issue of joinder for the remainder of trial.

We first address the defendant's request that we review his unpreserved claim pursuant to *State* v. *Golding*, supra, 213 Conn. 233.[7] "In the usual *Golding* situation, the defendant raises a claim on appeal which, while not preserved at trial, *at least was not waived at trial.* . . . [A] constitutional claim that has been waived does not satisfy the third prong of the *Golding* test because, in such circumstances, we simply cannot conclude that injustice [has been] done to either party . . . or that the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial . . . . To reach a contrary conclusion would result in an ambush of the trial court by permitting the defendant to raise a claim on appeal that his or her counsel expressly had abandoned in the trial court." (Citations omitted; emphasis altered; internal quotation marks omitted.) *State* v. *Hampton*, 293 Conn. 435, 448–49, 988 A.2d 167 (2009); see *State* v. *Hudson*, 122 Conn. App. 804, 813, 998 A.2d 1272 (same), cert. denied, 298 Conn. 922, 4 A.3d 1229 (2010). Accordingly, we must determine whether the defendant waived any claim challenging the joinder of the two cases at trial.

"[W]aiver is [t]he voluntary relinquishment or abandonment—express or implied—of a legal right or

notice. . . . In determining waiver, the conduct of the parties is of great importance. . . . [W]aiver may be effected by action of counsel. . . . When a party consents to or expresses satisfaction with an issue at trial, claims arising from that issue are deemed waived and may not be reviewed on appeal. . . . Thus, [w]aiver . . . involves the idea of assent, and assent is an act of understanding." (Citations omitted; internal quotation marks omitted.) *State* v. *Hampton*, supra, 293 Conn. 449.

The record in the present case demonstrates that defense counsel did not file an objection to the state's motion for joinder between December, 2009, when the state filed it, and September, 2011, the time of the defendant's trial.[8] In addition, the record suggests that the parties discussed the motion both in chambers and before the court. In chambers, it appears that defense counsel had suggested that there would "not be a lot of argument" regarding the motion. Then, when the court heard the parties on the motion, defense counsel expressly stated that there was no objection to the motion. After the court granted the motion, defense counsel did not indicate any disagreement with the court's decision. For the remainder of the consolidated trial, defense counsel did not raise the issue of joinder. In sum, the defendant had nearly two years to review the prospect of joinder, as well as an opportunity to raise an objection to the proposed joinder before trial. The defendant, nevertheless, did nothing to oppose the motion for joinder before trial, stated that he had no objection to the motion before the court, did not indicate any disagreement with the court's decision to join the two cases for trial, and thereby assented to the propriety of a consolidated trial.[9] On the basis of the foregoing, we conclude that the defendant waived any constitutional claims he may have had regarding the joinder.[10] "[A] party may not pursue one course of action at trial for tactical reasons and later on appeal argue that the path he rejected should now be open to him. . . . *Golding* is not intended to give an appellant a second bite at the apple." (Internal quotation marks omitted.) *State* v. *Kitchens*, 299 Conn. 447, 480, 10 A.3d 942 (2011).

We also reject the defendant's claim that it was plain error for the trial court to grant the state's motion for joinder. See Practice Book § 60-5. "Plain error review is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *State* v. *Myers*, 290 Conn. 278, 287–88, 963 A.2d 11 (2009). Because we have concluded that the defendant waived any claim regarding the joinder of the cases for trial, "there is no error to correct." *State* v. *Kitchens*, supra, 299 Conn. 474 n.18. "[A] valid waiver . . . thwarts plain error review of a claim." (Internal

quotation marks omitted.) *Mozell* v. *Commissioner of Correction*, 291 Conn. 62, 70, 967 A.2d 41 (2009).

The judgments are affirmed.

In this opinion the other judges concurred.

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victims or others through whom the victims' identities may be ascertained. See General Statutes § 54-86e.

[2] The defendant initially was arrested on the charges arising from J's case. Following further police investigation, on August 5, 2009, the defendant was arrested on charges stemming from G's case.

[3] With respect to J's case, the court sentenced the defendant to a term of fifteen years of imprisonment. With respect to G's case, the court sentenced the defendant to a term of fifteen years of imprisonment to run consecutively to the sentence in J's case.

[4] "Sexual contact" is defined as "any contact with the intimate parts of a person not married to the actor for the purpose of sexual gratification of the actor or for the purpose of degrading or humiliating such person or any contact of the intimate parts of the actor with a person not married to the actor for the purpose of sexual gratification of the actor or for the purpose of degrading or humiliating such person." General Statutes § 53a-65 (3).

[5] "Intimate parts" is defined as "the genital area or any substance emitted therefrom, groin, anus or any substance emitted therefrom, inner thighs, buttocks or breasts." General Statutes § 53a-65 (8).

[6] The defendant alternatively requests that we review his claim for plain error. See Practice Book § 60-5.

[7] Pursuant to *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Emphasis omitted; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40.

[8] We recognize that defense counsel was appointed to represent the defendant on December 8, 2009, approximately one week after the state had filed its motion for joinder.

[9] Our Supreme Court previously has recognized that defense counsel may waive a challenge to joinder for "tactical or other valid reasons." *State* v. *Berube*, 256 Conn. 742, 747, 775 A.2d 966 (2001); see *State* v. *Fleury*, 135 Conn. App. 720, 728, 42 A.3d 499 (decision to seek severance one of trial tactics), cert. denied, 305 Conn. 919, 47 A.3d 388 (2012). To the extent that the record in the present case contains no indication to the contrary, we must presume that defense counsel's acquiescence to the joinder of the two cases was for tactical purposes. See *State* v. *Fleury*, supra, 728 ("[i]t is well established that [w]e may assume with confidence that most counsel, whether retained or appointed, will protect the rights of an accused" [internal quotation marks omitted]). "[H]aving made the knowing, intelligent and voluntary choice to avail himself of the services of counsel, a defendant necessarily surrenders to that counsel the authority to make a wide range of strategic and tactical decisions regarding his case. . . . Absent a demonstration of ineffectiveness, counsel's word on such matters is the last." (Internal quotation marks omitted.) Id., 728–29.

[10] The defendant contends that we must review his claim in light of *State* v. *Payne*, supra, 303 Conn. 538, wherein our Supreme Court abandoned the presumption in favor of joinder that existed at the time the present case was tried. Id., 549–50. We are not persuaded. In the wake of *Payne*, our courts have reviewed trial court decisions to grant a motion for joinder only where the defendant did *not* waive the right to challenge it at trial. See, e.g., *State* v. *LaFleur*, 307 Conn. 115, 154 n.31, 51 A.3d 1048 (2012) (defendant specifically objected to state's motion for joinder); *State* v. *Perez*, 147 Conn. App. 53, 93 n.38, 80 A.3d 103 (2013) (same), cert. granted on other grounds, 311 Conn. 920, A.3d (2014); *State* v. *Morgan*, 140 Conn. App. 182, 194–95, 201–207, 57 A.3d 857 (2013) (same); *State* v. *Bree*, 136 Conn. App.

1, 6, 43 A.3d 793 (2012) (same), cert. denied, 305 Conn. 926, 47 A.3d 885 (2012); see also *State* v. *Kalil*, 136 Conn. App. 454, 477–78, 46 A.3d 272 (2012) (same in context of joining cases of multiple defendants), cert. granted on other grounds, 307 Conn. 955, 59 A.3d 1191 (2013); *State* v. *Cote*, 136 Conn. App. 427, 449, 46 A.3d 256 (2012) (same), cert. granted on other grounds, 308 Conn. 913, 61 A.3d 1100 (2013).

---