******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* MICHAEL CARLTON REDDICK
## (AC 35018)

Lavine, Keller and Schaller, Js.

*Argued May 14—officially released September 23, 2014*

(Appeal from Superior Court, judicial district of New Haven, Blue, J.)

*Deborah G. Stevenson*, assigned counsel, for the appellant (defendant).

*Jennifer F. Miller*, special deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Roger Dobris*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SCHALLER, J. The defendant, Michael Carlton Reddick, appeals from the judgment of conviction, rendered following a jury trial, of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4) and larceny in the third degree in violation of General Statutes § 53a-124 (a) (2). On appeal, the defendant claims that (1) there was insufficient evidence to support a finding that he committed the crimes charged; (2) the court failed to instruct the jury properly regarding a key witness' drug use and the effect it may have had on her perception; (3) the trial court failed to instruct the jury properly on the fallibility of eyewitness identifications; (4) the court improperly denied his motion for a new trial; and (5) he was deprived of his right to counsel pursuant to the federal and state constitutions when the state received privileged materials in error from the Department of Correction. We affirm the judgment of conviction.

The jury reasonably could have found the following facts. On March 15, 2011, the defendant's girlfriend, Jacqueline Crenshaw, invited her friend, Deyja Jackson, to travel from her home in Massachusetts and stay at the apartment she shared with the defendant in Hamden. Following Jackson's arrival, both she and Crenshaw smoked phencyclidine (PCP).[1] The next day, March 16, 2011, Jackson drove both Crenshaw and the defendant to a McDonald's restaurant located across the street from a branch of Bank of America on Dixwell Avenue in Hamden. They arrived at the McDonald's at approximately 11:45 a.m. and, within minutes of their arrival, the defendant exited the vehicle wearing a dark colored jacket, hat, glasses, and carrying a black bag.

At approximately 12 p.m., Anita Palmieri, a teller at the Bank of America branch, was setting aside money from her drawer following a large deposit when a black male wearing a hat, glasses, and a dark blue or black pea coat approached her counter. The man told Palmieri that he had a gun and demanded all of the money from her drawer, which she gave to him. The man then demanded more money, prompting Palmieri to inform him that she only had mutilated money[2] remaining. The man took the mutilated money as well. After placing all of the money in a bag, the man left the bank. Palmieri pressed a panic button, which notified the Hamden Police Department of an emergency. In addition to describing the gender, skin color, and clothing of the perpetrator, Palmieri later indicated to police that he was between five feet, three inches and five feet, five inches tall and approximately fifty years of age. Following the robbery, Jessica Philpotts, assistant manager at the Bank of America branch, noted in the bank's business records that the perpetrator stole $3405.50.

At approximately 12:03 p.m., Jackson observed the

defendant jog back to her car from the Bank of America branch across the street. Jackson noted that less than fifteen minutes had passed between the defendant's departure from her vehicle and his return. Once the defendant was back in Jackson's vehicle, he and Crenshaw requested that Jackson give them a ride back to their apartment. After dropping the defendant and Crenshaw off at their apartment, Jackson travelled to a nearby parking lot and smoked PCP until she blacked out.

Thereafter, when Jackson "came back to reality," she drove to a friend's New Haven residence. Later that night, Jackson watched a news story regarding a robbery at the Bank of America branch on Dixwell Avenue in Hamden. Hearing the story's description of the perpetrator, Jackson deduced that it was the defendant who had robbed the bank. Jackson subsequently contacted the Federal Bureau of Investigation (FBI) and reported her potential involvement in the Hamden bank robbery. The next day, March 17, 2011, the Hamden Police Department followed up on Jackson's tip to the FBI and requested that she return to Hamden. Jackson acquiesced and travelled to the Hamden Police Department, where she voluntarily gave a statement under oath concerning the robbery and identified the defendant as the perpetrator from a photographic array. In addition, the police showed Jackson photographs of the perpetrator from the bank's surveillance camera that recorded the robbery and, after reviewing them, she indicated that the photographs depicted the defendant.

Following the interview with Jackson, Detective Sean Dolan of the Hamden Police Department determined that there was probable cause to arrest the defendant. The Hamden Police Department subsequently alerted area police departments of its intention to arrest the defendant, and he was apprehended later that day. During his arrest, the police searched the defendant and seized a large quantity of money, which included bills marked consistently with the mutilated bills that Palmieri had described to the police.

The state, in a long form information, charged the defendant with robbery in the first degree, conspiracy to commit robbery in the first degree, larceny in the third degree, and conspiracy to commit larceny in the third degree. Following a trial, the jury found the defendant guilty of robbery in the first degree and larceny in the third degree.[3] The court imposed a total effective sentence of twenty-five years incarceration. This appeal followed. Additional facts and procedural history will be set forth as necessary.

## I

The defendant first claims that there was insufficient evidence to establish his identity as the perpetrator beyond a reasonable doubt. In support of his claim, the

defendant argues that Palmieri, the state's key witness, was unable to positively identify him as the perpetrator. The defendant further argues that the testimony of Jackson and Channing Reynolds, a second bank teller who witnessed the robbery, was insufficient to prove that the defendant was the perpetrator. As a result, he contends that the jury could not reasonably have concluded that the cumulative force of the evidence established his identity as that of the perpetrator beyond a reasonable doubt. We disagree.

The standard of review that we apply to a claim of insufficient evidence is well established. "In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have [found] that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Grant*, 127 Conn. App. 654, 660, 14 A.3d 1070, cert. denied, 301 Conn. 910, 19 A.3d 179 (2011). "[I]t does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence." (Internal quotation marks omitted.) *State* v. *Lopez*, 280 Conn. 779, 808, 911 A.2d 1099 (2007). "On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the . . . verdict of guilty." (Internal quotation marks omitted.) Id., 809.

On the basis of the evidence presented at trial and the inferences drawn therefrom, we conclude that the jury reasonably could have found that the state proved that the defendant was the perpetrator beyond a reasonable doubt. Even if Palmieri's testimony alone did not establish his identity as the perpetrator beyond a reasonable doubt, as the defendant argues, her testimony was not the only evidence presented as to the identity of the perpetrator. The jury had before it photographs from the bank surveillance cameras, a booking photograph of the defendant, and the photographic arrays wherein multiple witnesses identified the defendant as the perpetrator. When determining if the defendant perpetrated the charged robbery, the jury could have compared photographs of the perpetrator from the bank surveillance cameras with photographs of the defendant and, because he was present in court, their own observations of him. Furthermore, the jury could have compared the surveillance photographs, the photographs of the defendant, and their own observations of him in court with the descriptions of the defendant on

the date of the robbery provided by Jackson, Palmieri, and Reynolds.

Additionally, the jury heard Jackson's testimony that the defendant left her vehicle, which was located across the street from the Bank of America branch, just after 11:45 a.m. Palmieri testified that a man approached her counter at approximately 12 p.m., stating that he had a gun and demanding money. Jackson testified that, at approximately 12:03 p.m., the defendant then jogged back to her vehicle from the Bank of America branch and requested that she drive him and Crenshaw to his apartment on back roads. Moreover, Jackson testified that the defendant exited her vehicle wearing a hat, glasses, and a dark jacket which, according to Palmieri's testimony, was consistent with the clothing worn by the perpetrator. Also during trial, Palmieri testified that video surveillance footage from the time of the robbery, that depicted the perpetrator as a black male wearing a dark pea coat, hat, and glasses, was an accurate representation of her memory from that day. Thus, notwithstanding Palmieri's inability to conclusively identify the defendant as the perpetrator, the jury reasonably could have inferred from the totality of the evidence that the defendant exited Jackson's vehicle, proceeded across the street to the Bank of America branch, approached Palmieri's counter, told her that he had a gun, demanded and later took money from her, and then left the bank for Jackson's vehicle in order to depart the scene.

The defendant also attempts to cast doubt on the eyewitness testimony given in this case by directing our attention to the alleged uncertainty and unreliability of the eyewitness identifications. It is well settled, however, that "[t]he question of [the] identity of a perpetrator of a crime is a question of fact that is within the sole province of the jury to resolve"; (internal quotation marks omitted) *State* v. *Felder*, 99 Conn. App. 18, 24, 912 A.2d 1054, cert. denied, 281 Conn. 921, 918 A.2d 273 (2007); and we do not revisit the jury's credibility determinations. *State* v. *Russell*, 101 Conn. App. 298, 316, 922 A.2d 191, cert. denied, 284 Conn. 910, 931 A.2d 934 (2007). Furthermore, "[t]he rule is that the jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Ortiz*, 71 Conn. App. 865, 881, 804 A.2d 937, cert. denied, 261 Conn. 942, 808 A.2d 1136 (2002).

Viewing the evidence in the light most favorable to sustaining the verdict, we conclude that the cumulative effect of the evidence, namely, the testimony of Jackson and Palmieri and the reasonable inferences drawn therefrom, in addition to the photographic evidence, was sufficient to establish the identity of the defendant as that of the perpetrator of the charged offenses beyond a reasonable doubt.

II

The defendant next claims that the court failed to instruct the jury properly on the drug use of Jackson, a state's witness, and the effect it may have had on her ability to perceive. Specifically, the defendant argues that the absence of a special instruction on Jackson's PCP use both before and after the robbery constitutes reversible error because it was harmful beyond a reasonable doubt. We disagree.

The record reveals the following additional facts and procedural history. Prior to the empanelment of the jury, both the state and defense counsel were provided with the proposed jury instructions and had a meaningful opportunity to review the contents thereof.[4] The court circulated the instructions on May 14, 2012, and heard oral argument pertaining to the instructions on May 18, 2012. Prior to argument on May 18, 2012, however, the defendant submitted a proposed charge pertaining to Jackson, a state's witness, and the potential impact of her drug use on her testimony. The court considered the proposed charge but rejected it on the basis that it was argumentative and cumulative insofar as it was covered by the general instruction that pertained to eyewitness testimony. Defense counsel stated that he had no additional objection to the instructions overall, but sought to maintain his continued objection to the court's denial of his proposed instruction.[5]

"Our standard of review on this [nonconstitutional] claim is whether it is reasonably probable that the jury was misled. . . . The test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Therefore, jury instructions need not be exhaustive, perfect, or technically accurate. Nonetheless, the trial court must correctly adapt the law to the case in question and must provide the jury with sufficient guidance in reaching a correct verdict." (Internal quotation marks omitted.) *State* v. *Taft*, 57 Conn. App. 19, 29, 746 A.2d 813 (2000), aff'd, 258 Conn. 412, 781 A.2d 302 (2001).

"It is not error for a trial court to refuse to charge a jury in the exact words of a requested instruction, as long as the requested charge is given in substance." (Internal quotation marks omitted.) *State* v. *Collins*, 38 Conn. App. 247, 254, 661 A.2d 612 (1995). Although the court's instruction in this case did not mirror the defendant's request to charge, it did in effect cover the substantive points that he requested. The court proposed a general instruction, which was intended to encompass the totality of the eyewitness testimony presented.[6]

Following his review of the proposed jury instructions, the defendant continued to take exception to

the court's denial of his proposed specific instruction regarding Jackson's PCP use. The court stated that the proposed specific instruction was argumentative and that it was adequately covered by the credibility of witness instruction. The proposed instruction read: "In this case, you heard testimony from Deyja Jackson that she had used PCP around the time of the events that the State alleged happened on March 16 and March 17 of 2011. It was entirely proper for Deyja Jackson to be questioned about drug use and you may use such evidence in any way you see fit, including to determine how credible her testimony was. You may credit none, some, or all of her testimony given the fact that she admitted to using PCP. You may consider if her drug use affects her ability to recall events accurately." The state contends that the court's jury instruction as given substantively encompassed the defendant's proposed instruction. We agree.

Our review of the charge in its totality reveals that the court's instructions furnished adequate guidance as to the credibility considerations afforded to eyewitness testimony. Accordingly, we conclude that it was not reasonably probable that the jury was misled and, therefore, the defendant's claim is without merit.

### III

The defendant next claims that the court failed to instruct the jury properly on the fallibility of eyewitness identifications. The defendant concedes that this issue is unpreserved, but seeks review under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989), claiming that the record is adequate for review and the error is of constitutional magnitude. Alternatively, the defendant requests that we review his claim pursuant to the plain error doctrine. See Practice Book § 60-5. The state, in response, contends that defendant waived this claim during trial. We agree with the state.

We first address the defendant's request to review his unpreserved claim pursuant to *Golding*.[7] "In the usual *Golding* situation, the defendant raises a claim on appeal which, while not preserved at trial, *at least was not waived at trial*. . . . [A] constitutional claim that has been waived does not satisfy the third prong of the *Golding* test because, in such circumstances, we simply cannot conclude that injustice [has been] done to either party . . . or that the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial . . . . To reach a contrary conclusion would result in an ambush of the trial court by permitting the defendant to raise a claim on appeal that his or her counsel expressly had abandoned in the trial court." (Citations omitted; emphasis altered; internal quotation marks omitted.) *State* v. *Hampton*, 293 Conn. 435, 448–49, 988 A.2d 167 (2009); *State* v. *Hudson*, 122 Conn. App. 804, 813, 998 A.2d 1272, cert. denied, 298 Conn. 922, 4 A.3d 1229 (2010). Accordingly, we must

determine whether the defendant waived his claim challenging the omission of a jury instruction on the fallibility of eyewitness testimony.

The law pertaining to waivers in the context of instructional error is well settled. A waiver may be implied under some circumstances when the court actively circulates and seeks review of a proposed charge. See *State* v. *Kitchens*, 299 Conn. 447, 482–83, 10 A.3d 942 (2011). "[W]hen the trial court provides counsel with a copy of the proposed jury instructions, allows a meaningful opportunity for their review, solicits comments from counsel regarding changes or modifications and counsel affirmatively accepts the instructions proposed or given, the defendant may be deemed to have knowledge of any potential flaws therein and to have waived implicitly the constitutional right to challenge the instructions on direct appeal." Id. "The threshold question for our implied waiver analysis is whether the trial court provided the proposed charges to the defendant prior to delivery of its instructions to the jury." *State* v. *Davis*, 311 Conn. 468, 480, 88 A.3d 445 (2014).

Our review of the record reveals that defense counsel did not raise or suggest a general instruction pertaining to the fallibility of eyewitness testimony at any stage of the proceedings. The court provided defense counsel with a copy of the proposed jury instructions, permitted a meaningful opportunity to review such instructions, and solicited comments pertaining to such instructions. When defense counsel offered his comments, he did not request a general instruction on the fallibility of eyewitness testimony to the court, but stated that he had no further objection to the draft instructions presented to him. In doing so, the defendant waived his claim that the omission of such an instruction was improper and, therefore, cannot satisfy the third prong necessary to prevail under *Golding*. *State* v. *Coleman*, 304 Conn. 161, 174, 37 A.3d 713 (2013).

Finally, we also reject the defendant's request that we reverse the judgment of conviction on account of plain error with respect to this claim. See Practice Book § 60-5. "Plain error review is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Because we have concluded that the defendant waived any claim regarding [a general instruction on the fallibility of eyewitness testimony], there is no error to correct. . . . [A] valid waiver . . . thwarts plain error review of a claim." (Citations omitted; internal quotation marks omitted.) *State* v. *Cancel*, 149 Conn. App. 86, 102–103, 87 A.3d 618, cert. denied, 311 Conn. 954,     A.3d     (2014).

IV

The defendant next claims that the court abused its discretion in denying his motion for a new trial. The state argues that, due to the substantive inadequacy of the defendant's motion for a new trial, he failed to preserve his challenge to the denial of that motion. We agree with the state.

The record reveals the following additional procedural history. On May 25, 2012, the defendant moved for a new trial on the following basis: "Pursuant to Practice Book § 42-51, the defendant . . . moves for a new trial given any errors that may be apparent on the record that entitle him to a new trial." The defendant claims that this properly preserved his claim on appeal challenging the propriety of the court's denial of his motion for a new trial. We are not persuaded.

This court consistently has held that "the requirement of Practice Book § 60-5 that the claim be raised distinctly means that it must be so stated as to bring to the attention of the court the precise matter on which its decision is being asked." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Faison*, 112 Conn. App. 373, 380, 962 A.2d 860, cert. denied, 291 Conn. 903, 967 A.2d 507 (2009). "It is well established that an appellate court is under no obligation to consider a claim that is not distinctly raised at the trial level. . . . [B]ecause our review is limited to matters in the record, we [also] will not address issues not decided by the trial court." (Citations omitted; internal quotation marks omitted.) *Burnham* v. *Karl & Gelb, P.C.*, 252 Conn. 153, 170–71, 745 A.2d 178 (2000); see also Practice Book § 60-5 ("[t]he court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial"). "The reason for the rule is obvious: to permit a party to raise a claim on appeal that has not been raised at trial—after it is too late for the trial court . . . to address the claim—would encourage trial by ambuscade, which is unfair to both the trial court and the opposing party." (Internal quotation marks omitted.) *Remillard* v. *Remillard*, 297 Conn. 345, 351–52, 999 A.2d 713 (2010).

In the present case, the defendant did not apprise the court of any particular error that warranted a new trial. Indeed, the court, in response to the defendant's motion for a new trial, stated: "Let me just say . . . in terms [of] . . . the defendant's motion for a new trial, it's predicated on any errors that may be apparent on direct or that entitle him to a new trial, and without criticizing counsel in any way, no such errors have been pointed out to me. In fact, I think that the rulings the court made were correct as far as I know, and it seems to me that the motion must be denied." In failing to bring to the court's attention the precise matter upon which his motion for a new trial was predicated, the defendant failed to preserve his claim challenging the court's denial of his motion for a new trial.

Accordingly, we decline to review the defendant's unpreserved claim that the court abused its discretion in denying the defendant's motion for a new trial.

V

The defendant finally claims that the court failed to provide appropriate relief for the inadvertent disclosure to the prosecutor of attorney-client privileged communications, thereby depriving him of his constitutional right to counsel. The defendant requests review of this unpreserved claim pursuant to *State* v. *Golding*, supra, 213 Conn. 233, or, alternatively, for plain error. The state, in response, contends that the defendant waived this claim when defense counsel expressly asserted that he trusted the prosecutor's articulation of events and agreed that sealing the document was an adequate protective mechanism for the privileged material moving forward. We agree with the state.

"Both our Supreme Court and this court have stated the principle that, when a party abandons a claim or argument before the trial court, that party waives the right to appellate review of such claim because a contrary conclusion would result in an ambush of the trial court . . . . [W]aiver is [t]he voluntary relinquishment or abandonment—express or implied—of a legal right or notice. . . . In determining waiver, the conduct of the parties is of great importance. . . . [W]aiver may be effected by action of counsel. . . . When a party consents to or expresses satisfaction with an issue at trial, claims arising from that issue are deemed waived and may not be reviewed on appeal. . . . Thus, [w]aiver . . . involves the idea of assent, and assent is an act of understanding." (Citation omitted; internal quotation marks omitted.) *State* v. *McLaughlin*, 135 Conn. App. 193, 198, 41 A.3d 694, cert. denied, 307 Conn. 904, 53 A.3d 219 (2012).

The record reveals the following additional facts and procedural history. On May 8, 2012, during a preliminary proceeding, the prosecutor alerted the court to an inadvertent disclosure of attorney-client privileged materials, specifically, a letter that was sent to the state's attorney's office by the Department of Correction. The prosecutor asserted that once he identified the letter in question as privileged, he immediately stopped reading it. Following that incident, the prosecutor put the letter into an envelope, sealed, dated, and signed it, and put it in a safe in the state's attorney's office. The prosecutor represented, as an officer of the court and as a state's attorney, that neither he nor anyone else in his office reviewed the letter. The court offered an opportunity for defense counsel to speak on the matter, at which time he stated: "I don't think that the oath as an attorney was necessary. I don't have any trouble at all accepting his representation that he sealed the letter and didn't read it or stopped reading it as soon as he

realized what it was." Defense counsel requested that the letter remained sealed in the possession of the court. The court granted defense counsel's request.

Relying on *State* v. *Lenarz*, 301 Conn. 417, 22 A.3d 536 (2011), cert. denied,     U.S.    , 132 S. Ct. 1095, 181 L. Ed. 2d 977 (2012), the defendant argues that this claim was not waived and, in fact, was preserved for appellate review because "the trial court, sua sponte, is required to provide appropriate relief to prevent prejudice to the defendant  . . . ." The state, however, argues that *Lenarz* is factually inapposite to the present case. In *Lenarz*, despite court orders to the contrary, the prosecutor received *and read* attorney-client privileged materials, which specifically addressed trial strategy. Id., 420–22. Moreover, "the prosecutor not only failed to inform the defendant and the trial court of the invasion immediately, but also continued to handle the case, to meet repeatedly with witnesses and investigators and ultimately to try the case to conclusion more than one year after the invasion occurred." Id., 451. Although the defendant claims that the facts of *Lenarz* are analogous here, we find them wholly distinguishable. There is no dispute in the present case as to whether the prosecutor was in possession of the letter. The prosecutor immediately alerted the court as to his inadvertent receipt of the letter. In addition, the prosecutor took steps to mitigate the inadvertent disclosure by sealing the letter and recording the chain of custody upon identifying it as privileged. Defense counsel accepted the statement of the prosecutor that he had not read the letter and sealed it once he identified it as privileged. Thus, not only is *Lenarz* distinguishable, but it was the defendant who specifically requested the safety mechanism to rectify the inadvertent disclosure of the privileged letter. In failing to request further relief, the defendant assented to the relief that he originally requested, thereby waiving any claim with regard to additional relief that he now claims was warranted.

For the same reasons set forth in part III of this opinion, the waiver of this claim forecloses both relief under *Golding* and plain error analysis. See *State* v. *McLaughlin*, supra, 135 Conn. App. 198 ("claim that has been waived does not satisfy the third prong of . . . *Golding*" [internal quotation marks omitted]); *State* v. *Corona*, 69 Conn. App. 267, 274, 794 A.2d 565 ("a valid waiver . . . thwarts plain error review of a claim"), cert. denied, 260 Conn. 935, 802 A.2d 88 (2002).

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The drug phencyclidine is defined as "a piperidine derivative C17H25N used chiefly in the form of its hydrochloride [especially] as a veterinary anesthetic and sometimes illicitly as a psychedelic drug—called also *angel dust, PCP*." (Emphasis in original.) Merriam-Webster's Collegiate Dictionary (11th Ed. 2003).

[2] During trial, Palmieri testified that mutilated money refers to bills that are torn, worn-out, colored, or for any other reason, would not be distributed

to customers. Mutilated money is returned to The Federal Reserve per Bank of America company policy.

[3] The jury found the defendant not guilty of conspiracy to commit robbery in the first degree and conspiracy to commit larceny in the third degree.

[4] The following colloquy occurred between the court and defense counsel four days after the proposed charge was distributed:

"The Court: Prior to the opening of court, I have had a very productive chambers conference concerning the charge, and just for the record, I'm not sure if the record is explicit on this, so I'll make it explicit: I gave, I believe, on Monday copies of a draft charge to counsel. Am I correct there?

"[Defense Counsel]: Yes."

The defendant therefore was provided with a meaningful opportunity to review the proposed charge. See, e.g., *State* v. *Webster*, 308 Conn. 43, 63, 60 A.3d 259 (2013).

[5] The following colloquy occurred between the court and defense counsel:

"The Court: And addressing defense counsel, obviously, you have taken an exception concerning the specific proposed charge we have already discussed, but that aside, is there any proposed additions, subtractions, modification, any exception you wish to make to the Court's charge?

"[Defense Counsel]: No, your honor."

[6] The final charge to the jury on the credibility of eyewitness testimony was as follows: "The credibility of witnesses and the weight to be given to their testimony are matters for you to determine. However, there are some principles you should keep in mind. You may believe, all, none, or any part of any witness' testimony. In making that determination, you may wish to consider the following factors: (1) Was the witness able to see, hear, or know the things about which that witness testified? (2) How well was the witness able to recall and describe those things? (3) What was the witness' manner while testifying? (4) Did the witness have an interest in the outcome of the case or any bias or prejudice concerning any party or any matter involved in the case? (5) How reasonable was the witness' testimony considered in light of all of the evidence in the case? (6) Was the witness' testimony contradicted by what that witness had said or done at another time or by the testimony of other witnesses or by other evidence? If you find that a witness has deliberately testified falsely in some respect, you should carefully consider whether you should rely on any of that witness' testimony. In deciding whether or not to believe a witness, keep in mind that people sometimes forget things. You should consider whether a contradiction is an innocent lapse of memory or an intentional falsehood. That may depend on whether it has to do with an important fact or only a small detail. The weight of evidence does not depend on the number of witnesses testifying on one side or the other. It is the quality and not the quantity of the evidence that controls. All of these are factors that you may consider in finding the facts."

[7] Pursuant to *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Empahsis omitted; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40.